# WHEELING.

## WELCH *v.* INSURANCE CO.

Submitted June 7, 1883—Decided December 15, 1883.

1. In an action of *assumpsit* based on a policy of insurance against fire, the insurance was on the stock of wool of the assured in a certain building, and there was in the policy a clause, that "if the interest of the assured in the property be any other than the entire unconditional and sole ownership of the property for the use and benefit of the assured, it must be so represented to the company and so expressed in the written part of the policy, otherwise the policy should be void." This stock of wool insured was not so represented to the company nor was it so expressed in the written part of the policy, but was represented as the property of the assured and so expressed in the written part of the policy. It was proven by the plaintiff, that this stock of wool, which had been destroyed by fire, was purchased by a third person according to terms set forth in a letter from him to the assured. His letter was thus worded: "I propose this: You furnish the money; I will buy the wool, handle, store, bear one-half of the expense of insurance, interest, &c., for one-half the profit or one-half the loss. You hold the wool as your own to secure you for the investment." At the trial he asked this instruction of the court: "If the jury believe from the evidence, that the arrangement between the assured and this third person, under which the wool in controversy was bought and held, was that expressed in this letter, then there was a partnership between the assured and this third person in the profits or the losses of the transaction, still the interest of the assured in the

wool itself was the entire sole and unconditional ownership within the meaning of this policy." HELD :

The court should have given this instruction.   (p. 310.)

2. This third person being also an agent for a number of other parties in purchasing wool and putting this wool he bought all in the same warehouse whether purchased for the assured or others, and this warehouse having been burned by fire, and this third person as a witness for the plaintiff having testified that all the wool in the warehouse when burned was the plaintiff's, and that there was in it a certain number of pounds of wool worth so much, which was completely destroyed by the fire, and on cross examination it having appeared that his only means of knowing the quantity of wool in this warehouse burned was by subtracting from the quantity of wool he had bought for the assured and others and put in this warehouse the quantity he had taken from it and shipped, and he having produced his books to show the quantity thus purchased and shipped, the defendants were properly permitted to call numerous witnesses to contradict this witness and show that the entries on these books with reference to the quantities of wool purchased for the plaintiff as well as for others were false.   (p. 302.)

3. Depositions read before a jury ought not, against the protest of one of the parties to a suit, to be permitted to be taken to the jury-room on their retirement.   (p. 308.)

4. In such a case the court ought not to permit witnesses to be called as experts and their opinions to be given as to whether the quantity of wool claimed to have been burned in this warehouse could have been completely destroyed in the burning of a build ing of the size of the warehouse, this not being a question, on which expert-testimony should be heard.   (p. 305.)

GREEN, JUDGE, furnishes the following statement of the case :

At the October rules, 1879, D. B. Welch filed his declaration in *assumpsit* in the municipal court of Wheeling against the Franklin Insurance Company, in which it was stated that the defendant on February 27, 1879, made a policy of insurance, whereby for a valuable consideration, stated, the said defendant insured the plaintiff "against loss or damage by fire to the amount of eight thousand five hundred dollars on his (the said plaintiff's) stock of wool contained in the one and one half story frame shingle roof building situate in the town of Fairview, in the county of Harrison and State of Ohio."   The time this insurance was to last is stated to be

from February 27, 1879, at twelve o'clock at noon to the 29th day of March, 1879, at twelve o'clock at noon. All the provisions of this policy are set out in detail and so many of them as are deemed necessary will be hereinafter stated. The declaration then proceeds: "And the said defendant then and there to-wit on the day and year aforesaid, at th said city of Wheeling, delivered the said policy of insurance to the said plaintiff; and the said plaintiff says, that at the time of the making of the said insurance and thence until it was destroyed by fire, as hereinafter set forth, the said stock of wool in said policy mentioned was his, the said plaintiff's, and that his interest in the same was the entire unconditional and sole ownership." The declaration then alleged, that this stock of wool was burned, demolished and destroyed by fire on the 21st day of March, 1879. The declaration then sets out in detail the performance by this plaintiff of every act required by the said policy of insurance to be by him performed, and also the happening of all things, which it was necessary should have happened, to entitle the plaintiff to recover of the defendant three thousand six hundred and five dollars and seventeen cents. And being liable to pay the same the defendant undertook and promised the said plaintiff to pay him the said sum of three thousand six hundred and five dollars and seventeen cents, when he should be thereunto requested. The damages are laid at five thousand dollars.

This declaration was demurred to by the defendant, and in the demurrer the plaintiff joined issue, and the court overruled the demurrer. I have not stated the declaration more fully, because in this Court it is not claimed, that the municipal court erred in overruling this demurrer. The declaration is very full and has in it, so far as it appears to me every allegation necessary to be inserted in such a declaration.

The defendant also pleaded *non-assumpsit*,. and issue was joined; and on the 20th day of November, 1879, in open court the defendant under section 4 of chapter 66 of Acts of 1877 p. 90, filed the following plea and statement of defence :

"The defence in the above action being, among other things, that the action cannot be maintained because of the failure to perform and comply with, and the violation of, cer-

tain clauses, conditions and warranties in the policy in said declaration mentioned, said defendant here states the particular clauses, conditions and warranties in respect to which such failure and violation is claimed to have accrued, to-wit:

"1. The clause providing that if the interest of the assured in said property, whether as owner, trustee, consignee, factor, agent, mortgagee, lessee or otherwise should not be truly stated in said policy, then said policy should be void.

"2. The clause providing that if the interest of the said assured in the property be any other than the entire, unconditional and sole ownership of the property for the use and benefit of the said assured, it must be so represented to the said defendant and so expressed in the written part of said policy, otherwise the said policy should be void.

"3. That all fraud or attempt at fraud, by false swearing or otherwise, should cause a forfeiture of all claim on the said defendant under the said policy."

The plaintiff replied generally to this plea, and issue was joined; and on the 10th day of February a jury was sworn to try the issues. The trial continued till February 14, 1880, when the jury found for the plaintiff and assessed his damages at three hundred and ten dollars. The plaintiff then moved the court to set aside this verdict and grant him a new trial, which motion the court continued till the next term. It then and for several terms continued the motion and case, and on the 22d day of April, 1881, it entered up the following judgment:

"This 22d day of April, A. D. 1881, came the parties, by their attorneys, and the arguments of counsel having been heard by the court on the motion heretofore made by the plaintiff to set aside the verdict and grant in this action a new trial, and the same, with said motion having been maturely considered by the court, it is ordered that the said motion be and is hereby overruled. To which ruling of the court the defendant excepted, and tendered his bill of exceptions, and asked that it be signed and sealed by the court and made a part of the record therein, which is here accordingly done. Thereupon it is ordered by the court that the plaintiff, D. B. Welch, recover of and from the defendant, the Franklin Insurance Company, the sum of three hundred and ten dollars

in the verdict mentioned, with interest from the 14th day of February, A. D. 1880, until paid, and his costs about his suit in this behalf expended."

The bill of exceptions referred to sets out all the evidence given at the trial. The evidence given by D. B. Welch is as follows:

"I reside in Cadiz, Harrison county, Ohio, about seventeen or eighteen miles from Fairview, which is in the same county. I suffered a loss under the policy which has been introduced in evidence, the wool insured by it having been destroyed by fire on the night of March 21 and morning of March 22, 1879. At the time of the fire I was at Cadiz. On the morning of March 22d, I reached Fairview about 11 o'clock. I had not seen the wool for ten days or two weeks before. The building was entirely consumed when I got there. I saw smouldering embers. I have no knowledge as to amount of wool. The wool was mine, and it was taken care of by James Aiken who resided in Fairview. He purchased it for me with my money. He purchased it for me as my agent. There was no written agreement regarding purchase of wool for me. I had a letter, I think, regarding purchase of wool for me. Aiken proceeded, after receipt of my letter to buy wool for me. This is the letter I received.

"JULY, 11, 1878.

"*D. B. Welch, Esq.:*

"DEAR SIR:—In reply to your dispatch, would say the price would be from thirty-three to thirty-five cents. I would put up a fancy lot of wool; take nothing low in condition or quality. I could get up ten to twenty thousand pounds that I think would make some money at thirty-five cents in store. I would propose this: You furnish the money; I will buy the wool, handle, store, be at one half the expense of insurance, interest, &c., for one half the profit or one half the loss. You hold the wool as your own to secure you for the investment. I have plenty of orders for general purchase at thirty-three and one third and can put in more at thirty-four and thirty-five on the order I have just filled, but have faith enough to like to have an interest in a fancy lot of wool at thirty-five cents in store. The price is too low to

import good wool at the price. If you could make up your mind, would like to hear from you at once.

"Yours,

"JAMES AIKEN.

"I accepted the proposition made in this letter, and Aiken procceded to purchase the wool for me. The wool thus purchased was the same which was insured under said policy. When I arrived at Fairview, on March 22, I went down to see the place where the fire occurred, and on the same day telegraphed to T. P. Philips, the defendant's secretary, the probable amount of the loss. Some days after this, Philips visited Cadiz, and I asked him what it was necessary for me to do to furnish proofs of loss. He said there was no hurry about that; that they would send up an adjuster. I had not furnished proofs of loss at that time. On April 16 I sent to the defendant this paper." (The paper was offered in evidence, objected to by the defendant and excluded). "This paper was soon after returned to me. On April 26 I sent by mail in a registered letter to the defendant the following proof:

"CADIZ, O., April 25, 1879.

"*To Franklin Insurance Company, Wheeling, W. Va.*:

"I sustained a loss by fire, as you are fully aware of, on a lot of wool insured by you, as set forth in policy No. 12,399, on night of March 21st and morning of the 22d. Said policy bears date of February 27, 1879, and sets forth you insure the undersigned, D. B. Welch, against loss or damage by fire to the amount of eight thousand and five hundred dollars on his stock of wool contained in the one and one half story frame, shingle roof building, situated in the town of Fairview, Harrison county, Ohio. To particularize more fully my loss by the fire above referred to, will say that I purchased, during the summer of 1878, per my agent, Mr. James Aiken, wool to the amount of thirty-one thousand one hundred and seventy-five pounds, which was placed in the warehouse referred to in my policy; that I shipped from this amount of thirty-one thousand one hundred and seventy-five pounds previous to the fire twenty thousand three hundred and ninety-one pounds, leaving in house at the time of the fire ten thousand seven hundred and eighty-four pounds, which

was worth, as I believe, thirty-three and one third cents per pound, or three thousand five hundred and ninety-four dollars and sixty-seven cents. There was also burned twenty-one wool sacks, worth fifty cents—ten dollars and fifty cents; amount due me under policy three thousand six hundred and five dollars and seventeen cents. I further state that I was the sole owner of the wool destroyed, being in possession of and having entire control of the same; that there was no insurance by other companies on it; that the building in which my wool was when burned was the property, as I believe, of James Aiken, of Fairview, Harrison county, Ohio, and was insured, as I believe, to the amount of two hundred dollars, the company insuring it unknown to me. This building was used as a wool warehouse at the time of the fire, and is the same as referred to in my policy. As to the origin of the fire, will say that I am credibly informed the fire was first discovered about two o'clock on morning of March 22d last; that from the heading it had made on the building when first discovered, that it must have been burning some time. The building, with its contents, were entirely destroyed, or nearly so, the exception being a few damaged wool sacks that were saved."

The policy sued on was introduced in evidence. Its introductory paragraph was as follows:

"THE FRANKLIN INSURANCE COMPANY OF WHEELING, W. Va.

"In consideration of the receipt of seventeen dollars and the representations, covenants and warranties of the assured hereinafter named, do insure D. B. Welch, Esq., against loss or damage by fire to the amount of eight thousand and five hundred dollars on his stock of wool contained in the one and one half story frame, shingle roof building, situate in the town of Fairview, Harrison county, Ohio; and the said company hereby agrees to make good unto the said assured, his executors, administrators and assigns, all such immediate loss or damage, not exceeding in amount the sum or sums insured, as above specified, nor the interest of the assured in the property, except as herein provided, as shall happen by fire to the property so specified from February 27, 1879, at 12 o'clock at noon, to March 29, 1879, at 12 o'clock at noon,

the amount of loss or damage to be estimated according to the actual cash value of the property at the time of the loss, making due allowance for depreciation by use or otherwise, and to be paid at their office, in the city of Wheeling, W. Va., sixty days after due notice and proofs of the same shall have been made by the assured and received at said office, in accordance with the terms and provisions of this policy, hereinafter mentioned, unless the property be replaced, or the company shall have given notice of their intention to rebuild or repair the damaged premises."

The fourth clause of this policy was as follows:

"4. If the interest of the assured in the property be any other than the entire, unconditional and sole ownership of the property, for the use and benefit of the assured, or if the building insured stands on leased ground, it must be so represented to the company and so expressed in the written part of this policy, otherwise the policy shall be void. When property has been sold and delivered, or otherwise disposed of, so that all interest or liability on the part of the assured herein named has ceased, this insurance on such property shall immediately terminate. Goods held on storage must be separately and specifically insured."

On cross-examination the plaintiff testified as follows.

" I know that my wool was destroyed by fire. I have no personal knowledge that wool was in the wool house at the time of the fire. I saw in the ashes some fibers which appeared to be wool. I had the entire control of the wool. Aiken could have shipped the wool without my knowing it. He bought and shipped wool for other parties that season. In regard to the shipment of the wool in controversy, I had confidence in Aiken's honesty. I was at Fairview three or four times during the purchase of the wool. The wool was all purchased before March, I think. The wool was purchased by Aiken for me under his proposition, substantially, as contained in his said letter of July 11, 1878."

On re-direct examination the plaintiff testified as follows:

" I gave Aiken directions as to the shipments of the wool, and had evidences of his complying with my directions in the accounts returned to me by the purchasers of the wool."

The plaintiff proved by one witness, that in 1863 he had

twelve or thirteen thousand pounds of wool destroyed by the burning down of a frame three story house, the wool being in sacks on the lower floor; the wind was high; the fire occurred at noon, was a hot fire, and lasted about two or three hours. He was there all the time, could not see the wool during the fire; the wool was entirely consumed and there was no sign of wool after the fire.

James Aiken, who wrote the preceding letter, testified, that there were lost on the night of the fire, which occurred on March 21, 1879, about ten thousand pounds of wool, which belonged to the plaintiff worth about twenty-five cents per pound. Most of it was on the second floor loose and scattered about. He left the building at six or seven o'clock P. M. that day; heard of the fire at one or two o'clock that night; was the second or third man at it; when he saw it the building was a mass of fire. It was five or six o'clock in the morning, before they could get near the place where the warehouse stood; none of the wool remained unconsumed. The fire was so hot, that the scales and castings in the building were melted. On cross-examination he testified: The wool burned was all Welch's. I was to have no control over the wool but was to share with him the profits; the letter of July 11, 1878, was the contract. An affidavit of his was then produced, in which he among other things said: "He bought the wool in joint account of Welch and himself." He was disposed to deny that he ever made this affidavit, but finally said, he might have done so, as there were sharpers around, who may have put words in it he did not understand. He bought wool that season for a number of others, all of whom he named and their wool went into this warehouse. The wool he purchased for D. B. Welch which went into this warehouse was thirty thousand one hundred and eighteen pounds of net weight, of which he shipped before the fire twenty thousand two hundred and sixty-eight pounds of net weight. He did not keep that season the gross weight of wool. Some gross weights of unmarketable and unwashed wool appear on his leger put there two or three days after the fire. In those cases he got the amounts from those he had purchased from. His cross-examination occupied some fifty pages of the printed record. So much of it as is deemed

necessary in addition the above will be given in connection with the evidence for the defence.

The plaintiff proved by half a dozen witnesses who were at this warehouse the evening before the night, in which it was burned, that there was a large quantity of wool in the upper story; that at one end of this story the wool was piled up to the rafters, and it covered the whole floor, being three or four feet deep at the other end. Those of them, who put estimates on the quantity of wool in the upper story, estimated it at from seven to ten thousand pounds. There were also in the lower story eleven sacks of wool containing, it was estimated, fifteen hundred pounds of wool. Of these witnesses two had been engaged in hauling this wool during the three preceding days to the depot to be shipped. The quantity hauled was about one hundred and twenty-five sacks. Then half a dozen witnesses, who testify to the quantity of wool in the warehouse the evening before the night of the fire, speak of seeing it at different times from three o'clock P. M. till dark. All of the witnesses agree, that the wind was blowing the night of the fire, and that it was a very hot fire, so hot as to melt the castings in the building and a pair of scales that were in the middle of the lower room. The fire commenced at one or two o'clock, and before day the building was entirely consumed. The wool was entirely burned up, so that in the morning, there was no appearance of wool; two of the witnesses speak of not being able during the fire to see into the interior of the building.

The defendant on the other hand proved by two witnesses present at the fire, that after the weather-boarding was burned off, they could see into the interior of the building and saw nothing but the scales and a pile of wool-sacks, some of which were hooked out with poles. The defendant also proved by four different witnesses, that they had witnessed the burning of buildings, in which there was wool varying in quantity from one thousand to twenty-five thousand pounds, and that in none of them was the wool entirely consumed, that it was burned on the outside but when stirred up it could be seen that there was wool on the inside, though this would be much injured; that there was at times one-

third of the quantity not completely burned. The affidavit made by James Aiken, which he disputed, was proved to have been written by the adjuster of the defendant, and he says it was put down by him as near as he could in Aiken's language. It was signed by him just as it was presented to the court. The secretary of the defendant stated, that James Aiken told him he had given D. B. Welch his bond for half of the money he had advanced to buy the wool with, and he believes he told him his father-in-law was security on this bond.

The defendant also proved all the wool, which had been shipped from Fairview by James Aiken from July 1, 1878, to March 29, 1879. On August 7, 1878, he had shipped to Brown, Steere & Clark, Boston, thirty-one thousand two hundred and seventy-two pounds gross; on February 11, 1879, to H. N. Campbell & Co., Providence, R. I., seven thousand five hundred pounds gross; on February 13, 1879, to Brown, Steere & Clark, Boston, eight thousand three hundred and fifty-five pounds gross; February 14, 1879, R. W. & Co., Boston, nine thousand eight hundred and seventy-five pounds gross; to H. N. Campbell & Co., Providence, Road Island, two thousand three hundred and seventy-five pounds gross; and from the 14th to the 19th of March, 1879, to Brown, Steere & Co., Boston, Mass., eighteen thousand eight hundred and ninety-four pounds gross; and forwarded to Ed. Mellor & Co., Philadelphia, from the 19th to the 22d of March, 1879, twenty-one thousand four hundred and nine pounds gross. Some ten or twelve other witnesses were examined to contradict James Aiken. They were examined with reference to the quantity of wool they had sold to James Aiken, who had, as stated on his cross-examination, been purchasing wool for the various persons, to whom he had been thus shipping wool. His mode of ascertaining the amount of wool consumed by the fire of March 21, 1879, he stated, was by examining his books and ascertaining all the wool he had bought for these different parties, all of which had been put into this warehouse, and then by examining his books and ascertaining what quntity he had shipped to each of them or to their orders. He could ascertain, as he had done,

·accurately how much remained in the warehouse on March 21, 1879, and was destroyed by the fire. These ten or twelve witnesses were examined to prove, that his statement of the amount bought of them was not correct, but, the defendant claimed, had been fraudulently magnified, so as to represent that more wool had gone into this warehouse than really had gone into it. This he could safely, the defendant claims, misstate but could not misstate the quantity which had been taken out and shipped, as the books at the depot would show this correctly. The plaintiff on the other hand claims, that much of this supposed discrepancy between these witnesses and James Aiken arose from his careless way of keeping books, as stated by him, he not always taking the pains to set down correctly the name of the person, from whom he got the wool. He claims to have always put down correctly the estimated quantity of clean wool, which he bought, and to do this an abatement from the gross quantity was made, if the wool was dirty and unmerchantable, but he kept no memorandum of the amount of this abatement. While the books of the railroad do not show the nett amount of clean wool sent off, but the gross amount of the wool though a portion of it was dirty and unmerchantable, and the bags too were weighed, so that by such comparison more would appear to have been sent off than was sent off, and of course less would appear to be in the warehouse. The plaintiff claims too, that Aiken, as he says, frequently set down a number of different small lots of wool got at one time of different people on his books by aggregating all of these quantities and setting them down as one amount got from one person, it being immaterial whom he got it from, as it was paid for, and all he wanted was to keep a correct account of the quantity he got and the price he paid, and as he paid for the wool at a certain price for clean wool, he only put down what the wool he got would be equal to of clean wool; that for these reasons these ten or twelve witnesses could not in their statements be expected to correspond with the statement made by James Aiken, even when they each spoke the truth.

The plaintiff during the trial of this cause objected to the examination of these witnesses to contradict James Aiken in

his statements on cross-examination with reference to the quantity of wool bought by him for any person but the plaintiff, D. B. Welch; and as a test of the propriety of examining witnesses in reference to the quantity of wool, which he had bought for any one but the plaintiff, he took a bill of exceptions to the permitting of the testimony of one of these witnesses, James Endsley. The plaintiff also asked the court to give to the jury the following instruction:

"If the jury believe from the evidence that the arrangement between Welch and Aiken under which the wool in controversy was bought and held, was that expressed in the letter of July 11, 1878, then while there was a partnership between Welch and Aiken in the profits or the losses of the transaction, still the interest of Welch in the wool itself was the entire, sole and unconditional ownership within the meaning of the policy introduced in evidence."

To the giving of this instruction the defendant objected; and the court sustained the objection and refused to give the instruction, to which action of the court the plaintiff excepted. The court also gave the following instruction on the motion of the plaintiff:

"Where the policy provides that any false swearing or attempt at fraud, or fraud, shall avoid the policy, in order to avail itself of the defence, the insurer must show that the insured knowingly and intentionally swore falsely, or said or did that which is claimed to be fraudulent. There must be a willful intent to defraud rather than an innocent mistake. The false swearing of a mere witness examined on behalf of the insured, is not within the meaning of the provisions of the policy above referred to."

On motion of the defendant it gave the following instruction:

"If the jury believes from the evidence that D. B. Welch's interest in the wool claimed to have been destroyed was not the entire, unconditional and sole ownership for his own use and benefit, the jury must find for the defendant."

No other instructions were given; and when the jury were about to retire to consider of their verdict the defendant moved, that they be allowed to take with them to the jury room the depositions, which had been taken in the case and

read to them, which was objected to by the plaintiff but allowed by the court; and to this action the plaintiff again excepted.

To the judgment rendered by the court on the 22d day of April, 1881, the plaintiff has obtained a writ of error.

*Daniel Lamb* and *Henry M. Russell* for plaintiff in error.

*Caldwell & Caldwell* for defendant in error.

GREEN, JUDGE:

In this case there was a demurrer to the declaration. I presume, however, it was put in by the defendant's counsel only as a matter of precaution, that no possible injury should be sustained by their client through their fault. They have in their arguments in this Court pointed out no errors or faults in this declaration. I have examined it and find it very full; but, so far as I can perceive, there is no error in it. It appears to be well drawn and to contain in it every allegation, which if proven would entitle the plaintiff to recover what he demands. The municipal court therefore did not err in overruling this demurrer.

The plaintiff in error asks this Court to set aside the verdict of the jury, because under no view of the evidence, which can be taken, could a verdict for the plaintiff of only three hundred and ten dollars be reached. It is insisted, that it is clear upon the evidence, that the plaintiff is entitled to a verdict and judgment of several thousand dollars, or he is entitled to no verdict or judgment at all in his favor. It is admitted, that if the jury had found a verdict for the defendant, and the municipal court had rendered a judgment accordingly, this court on well established principles, could not have set this verdict and judgment aside and awarded a new trial, for there is clearly an abundance of evidence offered by the defendant, to which if the jury gave full credence and deduced from it facts, which they could have legitimately drawn from it without subjecting themselves to the charge of prejudice or corruption, they would have found a verdict for the defendant. On the other hand, if the jury had found a verdict for the full amount claimed by the plaintiff, and the

municipal Court had rendered a judgment accordingly, it must be admitted, that on well established principles such verdict and judgment would not be set aside by this Court; for the plaintiff certainly offered evidence, which, if full credence was attached to it by the jury, would have justified them in finding a verdict for the full amount claimed by the plaintiff. The case was eminently one, in which the verdict depended on the credibility of the witnesses and in which the evidence was to a very large extent contradictory; and of course the court could not properly in such a case set aside the verdict of the jury approved by the court below as either unsupported by evidence or as contrary to the great weight of the testimony, had this verdict been for the defendant. This being the case we cannot set aside a verdict and judgment for the plaintiff for three hundred and ten dollars upon his application; for though we may be satisfied that no view of the evidence would sustain a verdict of that amount, yet we cannot be satisfied that the plaintiff is injured by this verdict and judgment; for it is admitted that we cannot say he would have been clearly injured by a verdict and judgment against him. For all we can say he may have got by this verdict and judgment three hundred and ten dollars more than he is entitled to; and we must be satisfied that an error has been committed to his prejudice, before we can reverse a decision of the lower court at his instance. It is not alone sufficient, that we should be satisfied, that the judgment is erroneous. If the other side also had taken an appeal or had assigned counter errors, then it may be a different rule might prevail. Our conclusion is, that the judgment of the court below cannot be reversed in this case, unless the court during the progress of the trial fell into errors errors, whereby the plaintiff was prejudiced.

The first enquiry is: Did the court below permit the defendant to the prejudice of the plaintiff to occupy too wide a field in the introduction of evidence, and by so doing confuse the jury and permit it to be unjustly prejudiced against the plaintiff? The complaint is, that on the cross-examination of James Aiken the defendant required the production of his books showing all the wool, not only purchased by him for the plaintiff, Welch, but also that purchased by him

for various other parties as their agent, which wool as well
as that purchased for the plaintiff, Welch, had been put into
this warehouse, which was burned, the object being to show
what wool was put into this warehouse, and then by the
agent of the railroad company to show what quantity of wool
had been shipped by James Aiken, this all being admitted
to have been taken from this warehouse. The difference
between what was put into the warehouse and what was
taken from it and was shipped would show the quantity re-
maining in it at the time of the fire. This the plaintiff ad-
mits to be legitimate; and it is in fact the mode, in which
they ascertained the quantity of wool burned. But the ob-
jection of the plaintiff was, that, when on cross-examination
these books had been put in evidence for this purpose, and
the keeper of them, James Aiken, had been thoroughly ex-
amined with reference to the many entries on them not only
in reference to wool purchased for the plaintiff, Welch, but,
also in reference to the entries of wool purchased for all other
persons all of which were entered together on the same books,
then here the matter should have ended; that the answers of
James Aiken in reference to this wool purchased by him for
others were to be regarded as answers on cross-examination
as to collateral facts, and his answers should be regarded as
conclusive; and that the court ought not to have permitted
the defendant to examine a dozen witnesses with a view of
contradicting James Aiken with reference to the quantity of
wool he had purchased for persons other than the plaintiff,
Welch, and put into this warehouse; for such a course of
proceeding would render the trial almost interminable, and
tend to the confusion of the jury and to injustice by stirring
up prejudices. The plaintiff could not be prepared to meet
by evidence all the disputed facts with reference to the
quantity of wool purchased by James Aiken for numerous
parties through a period of many months preceding.

Upon this subject I think Shepley, judge, in pronouncing
the opinion of the court in *Lewis* v. *Hayden*, 17 Me. 272, (5
Shepley) lays down the law correctly. He says: "Is there
any such rule of evidence as deprives the defendant of the
right to discredit the witness, because on cross-examination
he permitted him to proceed and relate the whole of the

transaction between the parties? It is true, that, if he examines him as to a collateral fact, he must take the answer and cannot contradict it. (*Spencely* v. *De Willot*, 7 East 108; *Rex* v. *Watson*, 2 Stark. R. 116.) But this rule does not extend to the cross-examination upon facts material to the issue. And he may inquire into other material facts to the issue, than those elicited by the party calling the witnesses; and if the answers are not satisfactory, he may by any legal proof contradict or discredit them. 1 Stark. Ev. 164, (Metc. I., & G. Ed. 1876)."

Apply these principles to this case. The main question of fact in dispute was the quantity of wood in the warehouse, when it was burned. A legitimate mode of ascertaining this was to prove how much had been put into it, whether for the plaintiff or any one else, and subtract from that what had been taken out and shipped, whether in the name of the plaintiff or any one else. With reference to this material fact the defendant had a right to fully cross-examine the plaintiff's witness, James Aiken, and "if his answer was not satisfactory, he might by any legal proof contradict or discredit them." This the court below permitted the defendant to do by examining some dozen witnesses. Objection was made to the examination of only one, James Endsley; and the court overruled the objection and permitted the witness to be examined to contradict James Aiken with reference to the wool, which he had purchased for persons other than the plaintiff, Welch, and which wool had been put into the warehouse. This was in reference to a material fact involved in the disputed question in the case; and I think the court did not err in overruling the plaintiff's objection to the admissibility of the evidence. This no doubt opens a very large field for the introduction of evidence, but it seems unvoidable. The record shows that the defendant from the beginning disputed its liability for this loss, because, it asserted, James Aiken, who, it believed, was the half owner of the wool claimed to have been destroyed by this fire, was fraudulently pretending, that the quantity so destroyed was much greater than it really was, and had fraudulently made entries in his books to sustain him in this fraud. That this was the position of the defendant, the plaintiff was informed promptly

and before the institution of this suit. This being the nature of this controversy, it is obvious that the court must give, as it does in every case of alledged fraud, a large scope to the evidence.

The plaintiff again objects that the court permitted a number of witnesses to be examined as to their having knowledge of the destruction of wool by the burning of buildings in other instances, and from the knowledge which they had thus obtained, permitted them as experts to express their opinion on the question, whether the burning of this warehouse on the night of the 21st and 22d of March, 1879, could have consumed entirely the quantity of wool that was claimed to be in it. No exception was filed to the introduction of the evidence of a number of these witnesses, but an exception was filed by the plaintiff to the introduction of the evidence of one witness, Leon Bryant, the adjuster of the defendant. The question objected to by the plaintiff which was propounded to this witness was: "If a frame building eighteen by twenty-two feet and a story and a half high, containing ten thousand or twelve thousand pounds of wool in an upper story, should burn, state whether or not in your opinion the wool would be destroyed?" The court overruled the objection and allowed the witness to answer the question; and he answered, that he did not think it possible that ten thousand pounds of wool could be consumed in a building of this character. He further stated, that he believed, that one-third of this ten thousand pounds of wool would have remained unconsumed, if there had been that quantity in the building; and he therefore believed there was no such quantity of wool in the building, as all that was in it was consumed. He claimed to speak as an expert, because he had seen the *debris* of hundreds of thousands of pounds of wool destroyed in burning buildings from Iowa to Massachusetts. Of facts, which require proof by means of indirect evidence, says Starkie, there are some of so peculiar a nature, that juries cannot without other aid come to a direct conclusion on the subject. In such instances, where the inference requires the judgment of persons of peculiar skill and knowledge on the particular subject, the testimony of such as to their opinion and judgment

upon the facts, is admissible evidence to enable the jury to come to a correct conclusion. Thus the relation between a particular injury inflicted on a man's body and the death of this man is an inference to be made by medical skill and experience, and may be proved by one who possesses those qualifications.

These propositions of law laid down by Starkie are no doubt entirely correct; and in such a case, as he suggests, we must be allowed to resort to the evidence of experts, though, as we all know, even in such a case the evidence of experts is often contradictory and so unsatisfactory, as probably to furnish no real aid to a jury in reaching a just conclusion. But Starkie lays it down further, that when the enquiry relates to a subject, which does not require peculiar habits of study, in order to enable a man to understand it, the opinion of skilled witnesses is not admissible; and he is unquestionably right in this position.

The question is: To which class does this burning of wool belong? Does it require any peculiar study or opportunities of observation to enable one to understand the extent, to which wool is inflammable? It seems to me it does not, and one man knows about as much of the matter as another. The fact, that I have seen once or oftener the *debris* of wool consumed in a burning building, does not make me peculiarly skilled with reference to the extent of the inflammability of wool. The *debris* I have seen may show, that much of the wool was not completely consumed by the fire. But why it was not completely consumed, I cannot judge. It may be, because during the progress of the fire it was completely soaked with water, or because the fire was not a hot one, there being no wind blowing while the building was being burnt, or it may be the extent, to which the wool was consumed or left unconsumed depended on many other circumstances, of which I had no knowledge. The allowing me therefore because I have seen the *debris* of wool, which had been burnt in buildings, or had witnessed one or more fires, in which buildings containing wool had been burned, to express my opinion, whether a given quantity of wool could be completely consumed in the burning of a building of a particular size, is to permit me to pass a

judgment in the case, which the jury itself should pass and which probably they would be quite as competent to pass, and which in nine cases out of ten would be more likely to be correct, than one passed by this supposed skilled witness examined before them.   These witnesses are of course looked up by the parties; and as the results of the appearance of the *debris* of burned wool would vary much according to the circumstances, under which it was burned, which circumstances would not be remembered by the witness, even if they had ever been known to him, it would of course according to the diligence of the parties in looking up proper witnesses be made to appear, that wool could be completely consumed by fire or could not be.   In this case there is testimony of both sorts.    That of the defendants that it could not be completely consumed appears to preponderate.   But why?  Because such is the fact?  I suppose not, but simply because the defendant has been the more diligent in looking up witnesses, who had seen fires in which the wool was not completely consumed.   Doubtless with sufficient diligence a still larger number of witnesses might be found, who had seen fires, in which wool was completely consumed.   All such evidence therefore is calculated only to mislead a jury and should be excluded. . They should be left to pass their judgment on the question from the facts disclosed in evidence with reference to the particular fire.

The opinion of witnesses on such a subject too would no doubt be much influenced by their wishes and prejudices. Thus the witness, whose evidence as an expert on this subject, which the court permitted to be heard by the jury, and which was excepted to by the plaintiff, was the adjuster of the defendant, and thus perhaps naturally suspicious and prejudiced in favor of his employer.   The state of his mind in these respects may be judged of by a letter from him to the plaintiff in the record, which he begins thus: "DEAR SIR—Papers submitted by you to the Franklin Insurance Company of Wheeling *purporting* to be proof of loss under an *alleged* policy *claimed* to have been issued by said company have been forwarded to me with your letter for answer." The suspicious temperament here indicated suggest, that the opinion of such witness would hardly tend to enlighten a

jury, when this opinion was on a subject, of which probably they were as good judges as he, even if he had been unbiased by interest or prejudice.

The court below in this case admitted without objection other proof of this character, a portion of which was introduced by the plaintiff. As might have been expected, these opinions of experts, as they are called, were in direct and irreconcilable conflict. No such evidence should have been permitted to go to the jury. The able counsel for the defendant have found no decisions, in which evidence of this character or evidence in any way resembling this in cases of this character has been admitted, and the mere absence of any such decisions confirms me in the opinion, that expert evidence on such a subject should be excluded.

The court below in this case permitted the jury, when they retired, against the protest of the plaintiff, to take to their room the deposition of the witnesses, which had been read to them; and the plaintiff excepted to this action of the court. Did the court err in this? By the English practice depositions are never sent to the jury-room. A different practice has generally prevailed in Ohio. Their court of appeals in *Stites* v. *Adm'r. of McKibben*, 2 Ohio St., approve this Ohio practice and assign as their reason for so doing, "that it enables the jury to refresh their memory as to the testimony, which has been given. But the court may properly refuse to allow it in some instances, as where a part of the testimony contained in the depositions has been pronounced incompetent by the court, and as the jury might read this incompetent evidence, none of the depositions, which cannot be separated from it, ought to go to the jury. If the reason why the court refused to permit depositions to go to the jury does not appear, the appellate court will presume it was done for a good reason." In *Hansbrough et ux.* v. *Stennett*, 25 Gratt. 495, Judge Anderson in delivering the opinion of the court, says: "The court can perceive no reason why a deposition, which has been read to a jury, may not be given to the jury on their retirement, if what is objectionable has been erased." This is all that is said by him on the subject.

The Code of West Virginia ch. 131 § 12, p. 627, provides,

that "papers read in evidence though not under seal, may be carried from the bar by the jury." This provision was taken from the Code of Virginia, ch. 177 § 11, p. 732, and has long been statute-law in that State. With reference to this section this Court said in *State* v. *Cain*, 20 W. Va. 707: "This section evidently refers to documentary evidence and not to depositions. If depositions had been by the Legislature intended to be included among 'papers' that might be carried from the bar by the jury, a different designation would have been made. Depositions in legal parlance are not known as papers." This question then not being affected by this statutory provision and the common law of England having, it is admitted, always excluded depositions from being carried from the bar by the jury, I can see no reason why we should depart from the established common law rule. It seems to have been done in Ohio principally because a general practice prevailed in their circuit courts to permit depositions to be taken to the jury room. So far as we are informed the English rule with reference to this point very generally prevails in this State, and I see good reason for continuing the practice. It often happens as in this case, that the evidence on one side is oral testimony introduced before the jury, the witnesses being examined in person before the jury. The mass of the testimony on the other side is in the form of depositions read to the jury. If the case is an important one and the trial lasts for many days, if the depositions are permitted to be taken to the jury-room, and the minds of the jurors refreshed by the reading of the depositions, while the oral testimony of the other side has in a measure faded from the memory of the jury, it is obvious, that an undue advantage is given to the side, which is sustained by depositions. The Virginia decision would seem to have been rendered upon but little consideration, and no reason is given for their departure from the English practice. We hold this English practice as obligatory upon us until changed by statute-law, which it has not yet been so far as the taking of depositions to the jury-room is concerned. Even if my judgment did not approve this English practice, as it does, I could not depart from it, unless it was changed by statute-law. A common law practice,

which has always prevailed in England and in this State is binding law upon us. The municipal court therefore erred in permitting the depositions in this case to be taken to the jury-room against the protest of the counsel for the plaintiff.

It remains only to decide whether the court erred in refusing to grant the second instruction asked by the plaintiff's counsel. That instruction was as follows: ·

"If the jury believe from the evidence that the arrangement between Welch and Aiken under which the wool in controversy was bought and held, was that expressed in the letter of July 11, 1878, then while there was a partnership between Welch and Aiken in the profits or the losses of the transaction, still the interest of Welch in the wool itself was the entire, sole and unconditional ownership within the meaning of the policy introduced in evidence."

The terms of this arrangement as set out in this letter, were: "D. B. Welch was to furnish the money; James Aiken was to buy the wool, handle it, store it, bear half the expense of insurance, interest, &c., and James Aiken was to get therefor one half of the profits, and he was to bear one half of the losses. D. B. Welch was to hold the wool bought as his own to secure him in the transaction." This, it seems to me, is the plain meaning of this letter and almost the identical language used in it. The question for consideration is: Did Aiken under this arrangement have any ownership of the wool purchased by him under this arrangement with Welch? Now, as I undertand the law, there may be a partnership in the profits or a partnership in the profits and losses of an enterprise or adventure between the parties themselves, and yet they may not be partners in the capital stock, but it may belong exclusively to one of them; and if this be the understanding or agreement between the parties, the law will permit one partner to be and continue the exclusive owner of the capital, while yet there may be a partnership in the profits and losses coming out of the enterprise. To sustain this position Story in his work on Partnership refers to *ex parte Hamper,* 17 Ves. 403.

Where there is a positive agreement between the parties to this effect, that of course will govern. But if there is no such agreement and no implication from the circumstances

of the case, which would lead to the conclusion, that this was the understanding, there will be presumed to be a community of interest in the property as well as in the profits and losses. When by the agreement the property or capital is furnished by one partner, and the parties are to share equally or in any given proportion in the profits, and in the losses, no inference can be drawn that they are parties in the property or capital, but on the contrary the inference in such case is, that the partner who furnishes the property or capital remains the exclusive owner thereof. Thus if A. is the owner of goods and agrees with B., that B. shall be interested in a particular portion of the profit and loss of an adventure or voyage abroad, in which the goods are to be embarked, such an agreement will not make A. and B. partners in the goods as between themselves. (*Meyer* v. *Sharpe,* 5 Taut. 74; *Smith* v. *Watson,* 2 B. & C. 401; *Hesketh* v. *Blanchard,* 4 East. 144; *Hall* v. *Leigh,* 8 Cranch 50; *Clement* v. *Hadlock,* 13 N. H. 185.) But if the goods themselves are purchased on joint account or treated as joint property, or it is agreed that they shall be joint property though bought with the funds of one, then a different inference would arise, and the parties would be regarded as partners in the goods as well as in the profits and losses. (*Reed* v. *Hollinshead,* 4 B. & C. 867; *ex parte Gellar,* 1 Ross p.; *Soule* v. *Haywood,* 1 Cal. 345; *Sims* v. *Willings,* 8 Serg. & R. 103.

Now these principles are, it seems to me, as clearly illustrated and as forcibly set forth in the above cases cited as reported in 2nd Barnewall & Cresswell as anywhere else, and I will give below the syllabus in *Smith* v. *Watson,* 9 E. C. L. R. 122: "An agreement between A., a merchant, and B., a broker, that the latter should purchase goods for the former and in lieu of brokerage should receive for his trouble a certain proportion of the profits arising from the sale, and should share a proportion of the losses, does not vest in B. any share in the property so purchased or in the proceeds of it, although it made him liable as a partner to third persons." These views I have expressed receive more or less support from *Emmons* v. *Westfield Bank,* 97 Mass. 230; *Citizens Fire Insurance, Security and Land Co.* v. *Doll,* 35 Md. R. 90; *Boutelle* v. *Westchester Fire Co.,* 51 Vt. R. 10; *Keiser* v. *State,*

58 Ind. R. 379; *Boyce* v. *Brady*, 61 Ind. R. 432. The other case in Barnwell and Creswell, which, I think, illustrates the modification of the rule laid down above, is that of *Reid et al.* v. *Hollinshead et al.*, 10 E. C. L. R. 460. The syllabus of this case is as follows : "A., a merchant in London, by letter directed B., a broker in Liverpool, to purchase one thousand bales of cotton and stated that B. was to be allowed to be one third interested therein, acting in the business free of commission. B. agreed to purchase the cotton, and in the subsequent correspondence, which continued for upwards of three months, the transaction was referred to as a joint account, joint purchase, joint speculation, joint cotton-adventure. C. transmitted policies of insurance against loss by fire to A. and stated that the cotton was deposited in a room rented by him, B., and he held the key for their joint security. Held that B. was interested as a partner in the cotton, and consequently that a pledge of the whole by him, without any fraud or collusion on the part of the pawnee, gave a right to the pawnee to hold the goods as against A."

The conclusion, it seems to me, to be drawn from these cases is, that the question, whether an agreement between two parties constitutes them partners as between themselves only in the profits and losses of the business, or partners also in the property or capital invested in the business, depends for its answer entirely upon the intention of the parties to the agreement; and if the intention of the parties is not expressed explicitly in the agreement, if one is to furnish all the property or capital, with which the business is to be carried on, and the other furnishes only his labor in carrying on the business, the *prima facie* inference is that the parties are to be regarded as between themselves as partners in the profits and losses in the business and not as partners in the property or capital, with which the business is carried on, unless in the agreement of the parties or in their subsequent conduct of the business there be a clear indication, that the parties were to be regarded or regarded themselves as partners in the property or capital with which the business is conducted and in the absence of such indication in the agreement or in the conduct of the parties when the property or capital, with which the business is conducted, is fur-

nished by one partner only, he should as between the parties be regarded as the exclusive owner of such property or capital.

Applying this principle to the facts proven in this case my conclusion is, that on the face ot this letter of June 11, 1878, if it is the agreement, on which this business of buying and selling wool was to be conducted by Welch and Aiken, they can be held as between themselves to be partners only in the profits of this business and that Welch is to be regarded as having the entire, sole and unconditional ownership of the wool, which was purchased. This follows from the furnishing of all the capital by Welch, with which this wool was purchased, and from the fact that the compensation of Aiken for his labor and skill in purchasing, handling and storing the wool was to be one half ot the profits arising from its sale. This presumption is not rebutted by the fact, that he was to sustain one half of the losses, if any occurred. I regard the fact, that one half of the expenses, interest on the money used in buying the wool, &c., were to be as it were charged to Aiken in the settlement, as in no manner affecting the agreement or the relations of these parties to each other, or to the property purchased; for even had this been left out of this agreement, it would necessarily have been implied, as one half of the profits or losses could only be ascertained by charging Aiken with one half of the insurance, interest, &c.

There is some evidence tending to show, that this letter does not express truly the real understanding between these parties as to the character of this business and the relations of the parties to each other; and that there was an understanding further that they were to be joint owners of the property purchased. But if this letter, as these parties testify, expressed truly the terms of their arrangement for carrying on this business, then Welch was to be held as having the entire, sole and unconditional ownership of the wool purchased with his money; and the second instruction offered by the plaintiff ought to have been granted by the court. I am therefore of opinion, that the municipal court erred in refusing to grant this instruction.

For these reasons I am of opinion that the verdict of the

jury rendered on February 14, 1880, ought to have been set aside and that a new trial should have been awarded, the costs of the former trial to abide the result of the suit and that therefore the judgment of April 22, 1881, based on this verdict should be set aside, reversed and annulled and the plaintiff in error should recover of the defendant in error his costs in this Court expended; and this Court should enter up such judgment, as it is above indicated the municipal court should have entered; and this cause must be remanded to the municipal court of Wheeling to be further proceeded with according to the principles laid down in this opinion and further according to the principles governing courts of law.

REVERSED.    REMANDED.