Robert F. SCHMUNK,
Appellant (Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

No. 84–176.

Supreme Court of Wyoming.

Feb. 13, 1986.

Terry W. Mackey and Robert W. Tiedeken of Terry W. Mackey, P.C., Cheyenne, and James M. Shellow (argued), Stephen M. Glynn, and Janice A. Rhodes of Shellow, Shellow & Glynn, S.C., Milwaukee, Wis., for appellant (defendant).

A.G. McClintock, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., John W. Renneisen, Sr. Asst. Atty. Gen. (argued), Sylvia Lee Hackl, Asst. Atty. Gen. (argued), and

Frank D. Peasley, Converse County and Pros. Atty., for appellee (plaintiff).

Before THOMAS, C.J., and ROSE,* ROONEY,** BROWN and CARDINE, JJ.

CARDINE, Justice.

Appellant was charged with violation of § 6-2-101, W.S.1977 [1] and under this statute found guilty of first degree murder in the drug overdose death of his wife Kay Marie Schmunk. He appeals from the judgment entered upon the jury's verdict and his sentence of life imprisonment.

█ The critical question presented for our determination is whether several errors occurring during the course of trial, when considered together, created sufficient prejudice to deprive appellant of a fair trial. Without question cumulative error may assemble in such proportion that reversal is required. *Browder v. State*, Wyo., 639 P.2d 889 (1982); *State v. Allies*, 186 Mont. 99, 606 P.2d 1043 (1979).

We reverse.

## FACTS

Appellant Robert Schmunk, and Kay Schmunk were married in 1972 while residents of the State of Michigan. It was the second marriage for each of them. Kay Schmunk's two children from her prior marriage, Theresa Duncan and Bill Duncan, lived with appellant and Kay Schmunk during the time they resided in the State of Michigan. During 1979, appellant, his wife Kay Schmunk, and her son Bill Duncan, moved to Douglas, Wyoming where appellant commenced a general practice of medicine.

Kay Schmunk had suffered severe migraine headaches for many years prior to her death. Appellant prescribed oral medication and administered intramuscular injections of medication for these headaches

on numerous occasions. Kay Schmunk was also examined by several physicians with respect to her headaches and other medical problems. On May 6, 1981, she was seen by a neurologist in Casper, Wyoming, who stated in a written report:

"She has had headaches for at least 15 years. These can be continuous for up to 2-3 weeks. Except for this past week, she has been fairly headache free for several months. They begin with a cervical muscle fullness, ringing of the ears and occipital pain. She is often nauseated and vomits. Headaches are hemicranial, but change sides. Vision is occasionally blurred, and she does have photophobia.

"Her mother has less severe headaches, and her son has headaches associated with tension. Past history includes rheumatic fever at age 13. She does report being very depressed and, in fact, has wondered about suicide. She has refused counselling."

Robert Schmunk, Kay Schmunk, and her son, Bill Duncan, played a card game the evening of July 14, 1983. Kay Schmunk complained of a headache and, about midnight, appellant administered by intramuscular injection methadone, a narcotic, to relieve her pain. The card game continued for perhaps another thirty minutes before Kay Schmunk and appellant retired for the evening. About 2:00 a.m., appellant was aware that his wife was still in pain and, after some discussion with her, administered another narcotic injection, demoral. Appellant then fell asleep. He was awakened again about 4:30 a.m. with Kay Schmunk advising him that her headache was more severe, the worst she had ever had. Appellant then injected her with a third narcotic drug, morphine. About 6:30 a.m., he awakened and observed that his wife was not breathing. Appellant attempted resuscitation but was unsuccess-

---

* Retired November 1, 1985.

** Retired November 30, 1985.

1. Section 6-2-101, W.S.1977, provides:

"(a) Whoever purposely and with premeditated malice, * * * kills any human being is guilty of murder in the first degree.
"(b) A person convicted of murder in the first degree shall be punished by death or life imprisonment according to law."

ful. Mrs. Schmunk was taken to the emergency room at the Converse County Memorial Hospital where further efforts to resuscitate her failed, and she was pronounced dead.

An autopsy was performed July 16, 1983. The autopsy disclosed no apparent cause of death. The results of toxicology testing revealed that two of the narcotic drugs injected by appellant were three times the amount that would be consistent with the dosages reported by appellant. Appellant said he could not account for the quantity of drugs found by toxicology and insisted he had injected only the lesser amount he had reported. The cause of death was determined to be acute narcotic overdose resulting in respiratory depression and acute pulmonary edema.

The State began the trial in this case by telling the jury that it was not required to prove motive; that nevertheless it would produce evidence that would establish for the jury the motive, the reason why Dr. Robert Schmunk killed his wife, Kay Marie Schmunk. It was the theory of the State that Dr. Schmunk had "two diametrically opposed personalities." There was one Dr. Schmunk who was a devout person, worked selflessly for his church, and who appeared to have a normal loving relationship with his wife and a happy marriage. The other Dr. Schmunk, the State claimed, was a man unhappily married, whose wife was imperfect, and who was permanently leaving him to obtain a divorce. The imperfection in Kay Marie Schmunk was an apparent reference to her severe migraine headaches and dependency on drugs. With respect to the second Dr. Schmunk, the prosecutor told the jury, there is "a dark side to this man, to his mind."

The State of Wyoming staked its entire case of first degree murder upon the proposition that there was a dark, mysterious side to Dr. Schmunk, a man with a split personality who could not accept imperfection in Kay Schmunk and who, with premeditated malice, put her to sleep with drugs. In final argument to the jury, the prosecutor, summarizing the State's case, said:

"Why did Dr. Schmunk say he was buying [a rifle] for his girlfriend? He didn't say that to anybody who had an axe to grind, just to Dr. Erickson. I don't think there is a girlfriend. You may. You may read that in this; that is fair. "Profit? Sure, we have given you testimony of profit. Everything is in the wife's name. He has been divorced once before. He's got a quarter million dollars, almost, in assets in her name. Maybe that is a motive. You know, it would be a fair one. A little bit of insurance. There's no proof of big insurance, nothing, not a fourteen million dollar fortune like you hear about in some of these exciting cases. No million dollar life insurance, but it could have been a motive. I think it might have. I didn't prove it. I didn't really try to. I just laid it out here.

"Revenge? Was she leaving? Was she going to go? Could that be tied in to the money and the property? Was she going to go back to Michigan with everything in her name? Revenge to stop her from leaving. It was suggested, but not proven. If you want to play with it, go ahead.

"Jealousy? No, we didn't see any evidence of that. There were little things, little teasers thrown out, but I'll tell you what I think.

"I think there is a dark side to this man, to his mind. I think he has an inability to confront and accept what is real and imperfect. He could not accept that Kay was real and imperfect, and what he can't accept, he puts to sleep. That is what he did in this case. There is, I'm sure, in this man's mind some sad, sick perhaps pathetic reason why he did what he did, but I can't get it out of him. It didn't come out."

Thus, the State of Wyoming conceded that Dr. Schmunk had no girlfriend and that the killing was not for profit or revenge or because of jealousy, but because of a mysterious side of Dr. Schmunk that caused

him to kill what was imperfect. Appellant claims that there was no evidence from which the jury could find that he possessed a "dark side," a "mysterious side," a "split personality" that caused him to kill what was imperfect. He claims that the State's effort to prove that dark, mysterious side, the split personality, rested upon speculation, conjecture and innuendo resulting from the erroneous admission of a videotape interview, hearsay and other evidence and testimony, the cumulative effect being to deny him a fair trial.

The issues for our determination, as framed by appellant, are:

"[1] Should a mistrial have been declared when the prosecutor, in violation of a pretrial ruling, introduced polygraph results connected with defendant's alleged prior misconduct?

"[2] Did the trial court abuse its discretion in admitting witnesses' conjecture and speculation?

"[3] Was hearsay admitted in violation of W.R.E. § 804(b)(6) and the Confrontation Clause?

"[4] Was the prosecutor's expression in summation of his opinion of defendant's insanity plain error?"

We will not address other issues raised by appellant because they are unnecessary to our decision in this case.

### VIDEOTAPED INTERVIEW

On September 13, 1983, at the request of the investigator in this case, appellant went voluntarily to the sheriff's office to be interviewed concerning the death of Kay Schmunk. The interview was recorded on videotape secretly, without his knowledge. The video camera photographed appellant seated at a table and mostly showed the side and back of his head. Appellant cooperated fully with the investigator in giving the interview. There is no question but that the interview was given voluntarily and with full knowledge and waiver of Miranda rights. The day following the interview, appellant was indicted by the grand jury and charged with first degree murder.

At the end of the interview, the following questions were asked and answered:

"[Investigator]: Based on the information that you've given us, would you be willing to take a polygraph test?

"[Appellant]: I wouldn't take it; I would not take a polygraph under any circumstances for anybody whether I was guilty, innocent or questionable, no, I would not take a polygraph.

"[Investigator]: Have you had a bad experience with them or have you had one before that * * *

"[Appellant]: *I had a polygraph taken in reference to my daughter's charges against me, which was totally erroneous* and I'm, I'm just not willing to take a polygraph and hinge anything on what the, uh, the polygraph might suggest.

"[Investigator] Ok." (Emphasis added.)

The videotape was received into evidence and viewed and heard by the jury during the State's case in chief. Appellant contends that the above questions and answers should have been deleted from the videotape before it was offered into evidence and viewed by the jury. Appellant claims that the unedited videotape erroneously put before the jury evidence of a prior bad act (the charge by his daughter in the state of Michigan), the results of a polygraph test, his refusal to take a polygraph test, and that it was in violation of the court's order in limine.

### PRIOR ACTS OF MISCONDUCT

The jury learned, as a result of viewing the videotape, that some charge had previously been brought against appellant by his daughter. Appellant contends the alleged prior misconduct should not have been offered into evidence by the State because of the court's order excluding this evidence. The exclusionary order came about when, before trial at a hearing upon motions for change of venue and in limine, the following transpired:

"Gentlemen, beginning with the Change of Venue: You know, I have read the articles that you submitted, Counsel, with your brief, and I take note espe-

cially of the one article which goes into the Defendant's background from the State of Michigan and recites or reports such matters as acquittals from charges which—of course, when a person is acquitted of a charge and is found innocent, even though that was reported, the insinuation or implication might still remain in the minds of some citizens that those charges were properly brought in Michigan and the public sometimes has a way of reading into something of that nature something that isn't there.

"Of course, a good deal of this information, obviously, must have come to the paper on hearsay evidence or hearsay conversations with people, and having only, obviously, attempted to get one side of the story where there may have been another, that type of reporting does, in the mind of the Court, *produce an atmosphere of prejudice* in this community *against the Defendant * * *.*

*"In either event, it may not result in a fair trial for the Defendant.* So that being the case, gentlemen, I am going to grant the Motion for a Change of Venue * * *."* (Emphasis added.)

"THE COURT: * * * The next motion is a Motion In Limine.

"MR. BURLEY: Your Honor, the Motion in Limine that has been filed by the Defendant in this matter is directed to certain matters with respect to allegations or actions that the Defendant, Dr. Schmunk, may or may not have committed at a prior time.

"Particularly any matters concerning the Michigan Medical Practices Board or in the State of Michigan to the State of Michigan vs. Dr. Robert Schmunk."

In response, appellee's attorney stated:

"We would agree with Mr. Burley that as far as the information from the State of Michigan is concerned, it would be— not be proper for us to introduce it in our case in chief * * *."

And, in ruling upon the motion in limine, the court stated:

*"I will grant the Motion* In Limine as to the State's case in chief *as to any mat-* *ters that were or may have taken place in the past in the Defendant's life."* (Emphasis added.)

During the State's case in chief, the videotape, still containing references to charges in Michigan, was received into evidence without objection and then viewed by the jury. The court adjourned; and the next morning, before the trial commenced, appellant, in chambers, moved for a mistrial stating:

"Judge, I think we have an obligation to our client and our case in this matter to move for a dismissal in the matter by virtue of the prejudicial effect that the video tape had upon the jury in this matter. I think that the implication is very clear by virtue of the video tape and the particular portion which had to do with a polygraph where, number one, *the Doctor indicated on that video that he would not take a polygraph, and* the reason for him not taking a polygraph was a result of *a matter that had occurred with respect to his daughter, or charge by his daughter * * *.*

\* \* \* \* \* \*

"Although, I believe—I assumed, because of the substantial discussion, that all the Michigan stuff would be cut out and that everyone would monitor that to see that that would be done. Speaking from a human standpoint, I think the guards·are down and you're just expecting that the one that is in control of certain evidence, their witnesses as well as demonstrative evidence or video evidence, is the one that has that primary responsibility.

\* \* \* \* \* \*

"THE COURT: Thank you, Counsel. Well, gentlemen, I'm going to deny the motion. * * * [A]t the time I heard it, I was shaken by the fact that Michigan— even Michigan was mentioned, and the accusation. I wish it hadn't been in there. I do want to delete it. I think that probably the very fact, if we make some special instruction on it, this could—this is strictly up to Counsel—this

could serve to call it to the jurors' attention, or it could serve to soften the effect of it; I don't know.

"However, gentlemen, that I am leaving to Counsel. I don't really believe it's the State's job to be the watchdog over the entire plethora of evidence that has to come into the case. I wish it hadn't happened." (Emphasis added.)

The court had changed the venue for this trial from Douglas, Wyoming to Sheridan, Wyoming to avoid the prejudicial effect of the extensive pretrial publicity concerning charges against appellant in the State of Michigan. In changing venue, the court stated that the prejudicial effect of the Michigan charge "may not result in a fair trial." Admission of the unedited videotape informed the jury of the very evidence that the court had previously determined would be prejudicial and which had been the reason for the change of venue to Sheridan, Wyoming. And, although the jury learned that a charge had been brought against appellant by his daughter, it did not know the nature of the charge, its disposition, or how it related to this case. The jury was left to speculate upon this mysterious charge and could have considered it as evidence of the existence of appellant's dark side or split personality.

But the error here is ever more grievous for although prior acts of misconduct may be admissible to show motive, opportunity, intent, knowledge or absence of mistake, *Bishop v. State*, Wyo., 687 P.2d 242 (1984), cert. denied —— U.S. ——, 105 S.Ct. 1203, 84 L.Ed.2d 345 (1985); Rule 404(b), W.R.E., there is not even a claim here that the charges against appellant in Michigan might establish motive, opportunity, intent, knowledge, or absence of mistake. The State of Wyoming conceded in argument that "it would not be proper * * for us to introduce it * * *." We have said:

" 'It is a dangerous species of evidence, not only because it requires a defendant to meet and explain other acts than those charged against him and for which he is on trial, but also because it may lead the jury to violate the great principle, that a party is not to be convicted of one crime by proof that he is guilty of another.' " *Gabrielson v. State*, Wyo., 510 P.2d 534, 536 (1973) (quoting from *Rosencrance v. State*, 33 Wyo. 360, 239 P. 952, 953 (1925) ).

We have also stated that:

"[I]t is settled law in this jurisdiction that mere charges, accusations, and arrests are consistent with innocence; and they should not be inquired into if the purpose of the prosecution is to discredit the witness in the eyes of the jury and convey to the jury knowledge that such witness was charged with a crime." *Gabrielson v. State*, supra at 536 (quoted in *Bishop v. State*, supra, 687 P.2d at 248 (Cardine, Justice, dissenting) ).

Thus, great care should be exercised in the admission of prior-bad-act evidence because of the ever-present danger that a person accused of a crime may be convicted, not because of the evidence with respect to the crime charged but because of prior activities which a lay jury might incorrectly view as evidence of guilt. In all events, Rule 403, W.R.E., requires that such evidence should not be admitted if its probative value is outweighed by its prejudicial effect. *Grabill v. State*, Wyo., 621 P.2d 802, 808–809 (1980); *Elliott v. State*, Wyo., 600 P.2d 1044, 1049 (1979). In this case the prior act (charge) in Michigan had no probative value at all; and, in granting the motion to change the venue of the trial, the court had already determined that this evidence would be prejudicial to appellant in this case. When evidence of this unspecified charge against appellant was revealed and the prosecutor told the jury that a dark, mysterious side to appellant caused him to kill with premeditated malice, the jury could rationally conclude that the charge from Michigan was the basis for the prosecutor's theory. The jury was invited to speculate upon the charge—it might be anything, a crime involving drugs, an attempted homicide, or other activity that might reveal the "dark side of appellant" alluded to by the prosecutor. We are cognizant of the fact that the defense viewed

the videotape on two or three occasions, but that fact alone did not relieve the State of the obligation to delete the references to the Michigan incidents. We think appellant's objection to this evidence in the limine motion and the court's ruling preserved the error.

### POLYGRAPH EXAMINATION

The jury also learned from viewing the videotape that appellant

"had a polygraph taken * * * which was totally erroneous * * * and [was] just not willing to take a polygraph [in this case]."

■ Generally, the results of a polygraph examination are not admissible in evidence. *Cullin v. State*, Wyo., 565 P.2d 445, 455 (1977). Improper reference to the results of a polygraph examination has been held reversible error. See, e.g. *Birdsong v. State*, Okla.Crim.App., 649 P.2d 786 (1982); *State v. Green*, 271 Or. 153, 531 P.2d 245, 92 A.L.R.3d 1301 (1975). We have approved, upon stipulation of the parties, admission of the results of a polygraph examination. *Daniel v. State*, Wyo., 644 P.2d 172, 178 (1982); *Cullin v. State*, supra, at 455. In the absence of a stipulation for admission, a conviction must be reversed when the results of a polygraph are revealed to the jury. *State v. Sutherland*, 94 Wash.2d 527, 617 P.2d 1010 (1980); *State v. Kilpatrick*, 2 Kan.App.2d 349, 578 P.2d 1147 (1978). The reluctance to admit the results of a polygraph or "lie detector" examination stems from the fact that the results of these examinations have not been established as reliable. It also stems from a fear that jurors may give too much weight to the results of the examination, even perhaps accepting it as proof of guilt or innocence.

■ The results of the polygraph examination here referred to by appellant did not pertain to the charge for which appellant was on trial, but to a charge previously brought against him in the State of Michigan. We have already held that it was error to inform the jury of the charge against appellant in the State of Michigan.

That being so, it was also error to reveal to the jury the adverse results of a lie detector examination with respect to those charges.

### THE COURT'S ATTEMPT TO CURE—DELETION FROM THE VIDEOTAPE

■ The court, after the viewing by the jury, concluded that the reference to the charge and lie detector test in Michigan should be deleted from the videotape and the jury informed of the deletion. The jury, therefore, was instructed at the close of the case as follows:

"You are instructed that a certain portion of State's Exhibit 21, the same being a video tape recording, admitted into evidence has been deleted. You are therefore instructed that the deleted portion must not be considered by you as evidence."

Appellee contends that improper reference to the Michigan charge and polygraph was cured by the above instruction. Appellee concedes, however, that where appellant's credibility plays a vital role in the case, the reference to the polygraph may be prejudicial. Thus, a criminal conviction was reversed because of references by a prosecution witness to a polygraph examination of the defendant, despite a cautionary instruction to the jury to draw no inferences from the references. *United States v. Brevard*, 739 F.2d 180 (4th Cir.1984). The court noted that "[t]here are instances where the jury is exposed to inadmissible evidence which could make such a strong impression that instructions to disregard it may not remove its prejudicial effect." Id. at 182. See also *Bruton v. United States*, 391 U.S. 123, 135, 88 S.Ct. 1620, 1627, 20 L.Ed.2d 476 (1968); *Throckmorton v. Holt*, 180 U.S. 552, 569, 21 S.Ct. 474, 481, 45 L.Ed.2d 663 (1901).

Here Dr. Schmunk's credibility was crucial. He offered nothing but his own profession of innocence to rebut the inference from the testimony of the State's experts regarding the quantity of narcotics present in Mrs. Schmunk's body. The improperly

admitted evidence implicating him in some mysterious crime and disclosing his failure to pass a polygraph test would have so affected the jury that no instruction could restore Dr. Schmunk's credibility or overcome its prejudicial effect.

## REFUSAL TO TAKE POLYGRAPH TEST

■ Even more serious, however, was the court's decision to receive evidence which informed the jury that Dr. Schmunk had refused to take a lie detector test in this case. That occurred in this fashion. The videotape, State Exhibit No. 21, was played for the jury. Appellant moved to dismiss and for a mistrial and, as one of the grounds for his motion, stated: "[N]umber one, the Doctor indicated on that video that he would not take a polygraph * * *." The prosecuting attorney, referring to Dr. Schmunk's refusal to submit to a lie detector test, responded:

"I think it did paint a bit of the Defendant's personality, which we thought was of some significance in the course of the investigation, the pretense of cooperation while at the same time trying to manipulate the investigation.

"* * * It was, I think, helpful to the State, but not in the sense that it painted a bad picture about Michigan."

The court stated, "I do want to delete it." Surprisingly, after the deletion, the videotape that went to the jury room contained the following:

"[Investigator]: Based on the information that you've given us, would you be willing to take a polygraph test?

"[Appellant]: I wouldn't take it; I would not take a polygraph under any circumstances for anybody whether I was guilty, innocent or questionable, no, I would not take a polygraph.

"[Investigator]: Have you had a bad experience with them or have you had one before that * * *

"[Appellant]: * * * I'm, I'm just not willing to take a polygraph and hinge anything on what the, uh, the polygraph might suggest.

"[Investigator] Ok."

Thus, the videotape containing Dr. Schmunk's refusal to take a lie detector test went with the jury when it retired to deliberate and was available for repeated viewing by the jury. As edited, the videotape contained only his refusal with no explanation or reason therefor. The purpose of putting the refusal in evidence was stated by the prosecutor as, "it did paint a bit of the Defendant's personality" and revealed defendant's "pretense of cooperation while at the same time trying to manipulate the investigation."

In effect, the prosecutor was saying that the refusal of Dr. Schmunk to take the lie detector test tended to show "consciousness of guilt," for surely only a guilty man would "try to manipulate the investigation."

It is uniformly held that evidence that an accused has refused to take a lie detector test is not admissible to establish "consciousness of guilt." 29 Am.Jur.2d Evidence § 296. Thus, reference by the prosecutor to a refusal of the accused to take a lie detector test required reversal, *State v. Driver*, 38 N.J. 255, 183 A.2d 655 (1962), and reversal was required also where reference to the refusal was in a recorded, taped interview. *State v. Emory*, 190 Kan. 406, 375 P.2d 585 (1962).

In *Mills v. People*, 139 Colo. 397, 339 P.2d 998 (1959), defendant, when asked, replied that he would not take a lie detector test. The evidence of refusal was admitted as showing "consciousness of guilt." After declining to set forth the "sordid details" of the crime for which defendant was convicted of first degree murder, the appellate court stated (quoting from *State v. Kolander*, 236 Minn. 209, 52 N.W.2d 458, 465 (1952):

"'The impact upon the minds of the jurors of a refusal to submit to something which they might well assume would effectively determine guilt or innocence, under these conditions, might well be more devastating than a disclosure of the

results of such test * * *.'" Id. 339 P.2d at 999.

The court then said:

"All too frequently this court is compelled to reverse judgments of guilt in important criminal cases because of overzealous prosecution. It is the duty of prosecuting officers to guard against the introduction of incompetent evidence. Overprosecution of an accused should not be permitted by the trial court. In the instant case the district attorney insisted at great length upon introduction into evidence of testimony [refusal to take a lie detector test] which is uniformly held to be incompetent, in an unbroken line of authorities throughout the nation." Id. 339 P.2d at 999–1000.

It was error to inform the jury of Dr. Schmunk's refusal to submit to a lie detector test. The error was repeated when, after objection, the videotape was edited to contain only the refusal to take a lie detector test and sent to the jury room to be viewed during deliberations.[2]

The great mass of authority holds it error to admit evidence of appellant's refusal to submit to a lie detector test. The admission of this evidence is again especially troublesome where the jury is informed that there is something dark and mysterious about Dr. Schmunk and leaves them to wonder and speculate concerning the reason for the doctor's refusal as it might relate to the motive for killing his wife.

We note here that the practice of sending the videotaped testimony of a witness to the jury room for repeated viewing during deliberation poses the danger of unduly emphasizing that testimony over all of the other testimony in the case. That danger

is even greater where testimony is in the form of a videotape, for:

"Videotape testimony is unique. It enables the jury to observe the demeanor and to hear the testimony of the witness. It serves as a functional equivalent of a live witness." *United States v. Binder*, 769 F.2d 595, 600 (9th Cir.1985).

In this case, the jury could have observed and heard Dr. Schmunk on the edited videotape, repeatedly and emphatically refusing to submit to a lie detector test without stating a reason for his refusal. His credibility was crucial to his defense. In *United States v. Binder*, supra, the trial judge allowed the jury to replay the videotape in an *abridged fashion*, and the appellate court still reversed the conviction stating:

"Under these circumstances the videotaped testimony may have taken on great significance. Allowing the jury to see and hear the children's videotaped testimony a second time in the jury room during deliberations unduly emphasized their testimony." 769 F.2d at 601.

We think repeated viewing of the Schmunk videotape contained an enormous potential for depriving him of a fair trial.

## STATEMENT OF WILLIAM DUNCAN

■ William Duncan was 17 years of age, attending high school, and living with appellant and his mother at the time of this incident. He was questioned by the investigator before trial concerning the death of his mother on several occasions but did not then state that he believed Dr. Schmunk had killed her. Then, during the trial, he testified:

"Q. Why did you leave Douglas, Wyoming?

2. Article 1, § 11, Wyoming Constitution, provides: "No person shall be compelled to testify against himself in any criminal case * * *." A lie detector test involves a response to questions asked by the examiner. A suspect may not wish to answer those questions because the answers may incriminate him or the polygraph may disclose the answers to be lies that might incriminate him. It might be said that a polygraph examination is not testimonial in nature and therefore the privilege against self-incrimination

does not apply. It is a close question. We think the refusal to answer the questions of a lie detector examiner is not very different from a refusal to answer questions of a detective at the police station. A suspect has a constitutional right to remain silent, to refuse interrogation, *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 1883, 68 L.Ed.2d 378 (1981). Evidence or comment upon exercise of the right to remain silent has long been held prejudicial error. *Westmark v. State*, Wyo., 693 P.2d 220 (1984).

"A. Because of the suspicions of my father killing my mother."

There was an objection and the court stated:

"I would overrule the objection anyway."

The State argues that Billy Duncan's statement that he *suspected* that his father had killed his mother was properly admitted into evidence because Billy had personal knowledge of the matter as required by Rule 602 W.R.E.; that it concerned his state of mind, and was not an opinion of appellant's guilt but was a statement of fact. Appellant contends that the context of the statement was such that the jury would clearly understand that Billy was stating his personal belief, "suspicion" that Dr. Schmunk had killed his mother. It is a close question, but assuming appellant to be correct, it would have been best if the trial court had sustained the objection.

### PERSONAL KNOWLEDGE

Rule 602, W.R.E., provides in part: "A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter." The personal knowledge requirement is imposed because

"[t]he trier of fact should base its decision upon good and trustworthy evidence, and 'personal knowledge' really means firsthand knowledge which has come to the witness through his own senses. Thus, a witness may testify to an event or occurrence which he has seen himself, but not one which he knows only from the description of others." 3 Louisell and Mueller, Federal Evidence § 259 at 36.

We seriously question that Billy had "personal knowledge" that his stepfather had killed his mother. No one states what firsthand knowledge Billy acquired through his own senses or what he observed that would constitute the necessary personal knowledge. The appellee in its brief merely states:

"Clearly, he had ample personal knowledge of the answer to that question. * * Nine days before he left Douglas, the grand jury indicted Appellant for the first degree murder of Billy's mother."

Personal knowledge generally refers to what a witness knows because of an event he has perceived.

"[T]he testimony must be based upon events perceived by the witness through one of the physical senses. The rule—an extension of the law's preference that decisions be based on the best evidence available—is grounded in the realization that the possibility of distortion increases with transfers of testimony, and that consequently the most reliable testimony is that which is obtained from the witness who himself perceived the event." (Footnotes omitted.) 3 Weinstein & Berger, Weinstein's Evidence ¶ 602-[01]. See also, *Joy Manufacturing Company v. Sola Basic Industries, Inc.*, 697 F.2d 104 (3rd Cir.1982).

There is no statement by anyone of what event Billy perceived that would justify his statement that his mother was killed by Dr. Schmunk. We suggest it was inadmissible upon this ground alone. But, appellee contends that what Billy said was a statement of fact. Billy said it was a *suspicion,* and we are hard pressed to agree that when A says "I suspect B killed C," A has stated a fact. "I believe" or "in my opinion" might be synonomous with "I suspect," but is not synonomous with "I saw B kill C." And so the statement by Billy was no more than a suspicion that Dr. Schmunk had killed his mother and was clearly a statement of his opinion.

An opinion by a lay witness is admissible if

"his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue." Rule 701, W.R.E.

### RATIONALLY BASED ON PERCEPTION OF WITNESS

Rule 701, W.R.E., incorporates the personal knowledge requirement of Rule 602

which we have heretofore discussed. Thus, it is said that:

"Under Rule 701, the witness must have perceived firsthand the pertinent events or matters, and his inference or opinion must be rationally based on his perception; his testimony must be rejected if his firsthand observation was inadequate to support an opinion." 3 Louisell and Mueller, Federal Evidence § 376 at 618–619.

In *Joy Manufacturing Company v. Sola Basic Industries, Inc.*, supra, 697 F.2d at 111, it was said:

"The court is in essence requiring that the best evidence available—first-hand knowledge verses second-hand knowledge—be presented to the jury for use in its deliberation."

In *Gorby v. Schneider Tank Lines, Inc.*, 741 F.2d 1015, 1021 (7th Cir.1984), the testimony of a witness who proposed to state that "Welch did 'everything he could to avoid [the] accident,'" and that "Gorby could have avoided the accident" was rejected by the court because they were based upon speculation rather than firsthand knowledge or observation. It was pointed out that the witness could only observe one vehicle, could not know what the drivers perceived, nor was he familiar with the vehicles.

Where the proffered opinion of the witness was an opinion by a lay witness and encompasses a legal conclusion,

"a trial court may very properly conclude that a response would not be helpful to the trier of fact. The danger here is that the jury could easily accord too much weight to the pronouncement of a lay witness unfamiliar with the standards erected by the criminal law, whose statement may be charged with the emotionalism of a person coming to the rescue of an embattled co-worker." (Citations omitted.) *United States v. Ness*, 665 F.2d 248, 250 (8th Cir.1981).

When Billy testified of his "suspicions of my father killing my mother," that suspicion was not based upon personal knowledge or perception and was not admissible because Dr. Schmunk had been indicted for first degree murder. The question and answer added nothing to the case. The reason Billy left Douglas was irrelevant to any issue before the jury. His testimony was both inadmissible and prejudicial.

### HELPFUL TO A CLEAR UNDERSTANDING

The opinion of the lay witness must also be helpful to a clear understanding of his testimony. Rule 701, W.R.E., supra. Where a witness is asked

"whether the conduct in issue was 'unlawful' or 'wilful' or whether the defendants 'conspired,' terms that demand an understanding of the nature and scope of the criminal law, the trial court may properly conclude that any response would not be helpful to the trier of fact. The witness, unfamiliar with the contours of the criminal law, may feel that the legal standard is either higher or lower than it really is. If either event is true the jury may accord too much weight to such a legal conclusion." *United States v. Baskes*, 649 F.2d 471, 478 (7th Cir.1980), cert. denied 450 U.S. 1000, 101 S.Ct. 1706, 68 L.Ed.2d 201 (1981).

We have said that Billy's statement that he suspected his father killed his mother was not rationally based on any perception by him. We are unable to ascertain how his opinion that he suspected Dr. Schmunk had killed his mother would be helpful to a clear understanding of his testimony.

There was before this jury all of the facts, testimony of experts, investigators, officers, physical evidence, the autopsy, and toxicology. The jury was in the best position to reach a conclusion on the matter of guilt or innocence—the ultimate issue in this case. Should we condone this type of opinion evidence, we could expect in the future that the State might call five witnesses to say they suspect the defendant is guilty. The defendant then would surely be permitted to call five witnesses to testify that they suspect he is innocent. It is said that " 'assertions which amount to lit-

tle more than choosing up sides,' such as statements that the defendant is 'liable' or 'at fault' or 'guilty,' " 3 Louisell and Mueller § 376, do not satisfy the helpfulness requirement. Such a procedure would be absurd. It would detract from important evidence and would not be helpful to the jury in deciding the ultimate issue in the case. This type of opinion or conclusion should not have been admitted.

The State next contends that Billy's opinion was admissible as revealing his state of mind at the time he left Douglas, Wyoming. Suffice it to say here that Billy's state of mind at the time he left Douglas, Wyoming was not relevant to any issue in this case. The reason he left Douglas was not proof of any material fact relating to the charge of first degree murder against Dr. Schmunk.

> "All relevant evidence is admissible, except as otherwise provided by statute, by these rules, or by other rules prescribed by the Supreme Court. Evidence which is not relevant is not admissible." Rule 402, W.R.E.

The statement was not admissible under the state-of-mind exception in Rule 803(3), W.R.E., as suggested because that rule concerns the admissibility of hearsay evidence, and this was not hearsay. It was not relevant and, therefore, not admissible. It was not admissible as an opinion of a lay witness. The admission of this opinion, therefore, was error.

### ADMISSION OF HEARSAY STATEMENTS NOTICED APRIL 30, 1984

■ Pursuant to the provisions of Rule 804(b)(6), W.R.E., infra, the State served appellant with a notice on April 25, 1984, and a second notice on April 30, 1984, advising appellant of the name and address of the declarant who would testify to hearsay statements of Kay Schmunk concerning her desire to leave appellant and return to the state of Michigan. The place of trial had been transferred by change of venue from Douglas, Wyoming—where this incident occurred—to Sheridan, Wyoming.

The notice of April 30 was served on appellant's attorney in his motel room in Sheridan two days before trial was to commence. Appellant's counsel objected to the notice of April 30, 1984, claiming it did not permit sufficient time to prepare to meet the proposed hearsay as required by Rule 804(b)(6), did not comply with the spirit of the rule, referred to hearsay statements by Kay Schmunk in October 1982 and February 1983 which were far removed and vastly different from the proposed hearsay in the first notice of April 25, and finally because appellee had interviewed all of the witnesses more than nine months prior to trial, had the information available and could offer no reasonable excuse for not having given notice sooner. Appellee responded that, although the notice was late, it concerned the same type of hearsay evidence as listed in the notice of April 25 to which there was no objection and, in addition, it was admissible under Rule 803(3), W.R.E., as establishing declarant's state of mind.

The court, in ruling on the motion, stated:

> "It does disturb me that you had nine months and one trip back there [to Michigan] and * * * these statements are coming in on the Monday of the trial. * * I'll tell you what, gentlemen. I'm going to overrule the motion. I'm going to allow the testimony, but I think this should have been discovered some time ago. If you're going to put it in, I think the notice should have probably been given to them before the morning of the trial."

It is a general rule that hearsay evidence is not admissible. There is no opportunity for confrontation or cross-examination, there is no manner of judging the credibility of the person making the statement or the weight to be given to it, there is the potential for memories to dim with the passage of time, and a potential for inaccurancies and even falsehoods in the second-hand hearsay statements offered as evidence. This general hearsay exclusionary rule was incorporated into Rule 802,

W.R.E., which provides that hearsay is not admissible except as provided by the Wyoming Rules of Evidence or by other rules adopted by the Wyoming Supreme Court or by statute. Rule 803, W.R.E., sets forth twenty-four exceptions and Rule 804 sets forth an additional six exceptions to the exclusionary hearsay rule. These exceptions permit the receipt of hearsay evidence if the requirements of the exceptions are satisfied.

It seems clear that almost any hearsay statement can in some tortured fashion be claimed to fit into one of the exceptions provided by Rules 803 and 804, W.R.E. But to hold that all hearsay fits into one of the exceptions and therefore is admissible is to permit the exception to the hearsay rule to swallow the rule excluding hearsay evidence. And so the general rule is, and should remain, that hearsay is not admissible. Nor should the trial court, under the guise of liberal construction of the Rules of Evidence, admit all hearsay without giving due consideration to the guarantees of trustworthiness and other requirements of the rules. Ordinarily strict compliance with the requirements of the exceptions to the hearsay rule should be enforced; and, if the proposed hearsay cannot meet those strict requirements, it should be excluded. In this case, it is clear that with respect to the proposed hearsay statements of Kay Schmunk noticed on April 30, 1984, there was not compliance with the requirements of Rule 804(b)(6) which provides:

"*Other Exceptions.*—A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and interests of justice will best be served by admission of the statement into evidence. However, *a statement may not be permitted* under this exception *unless the proponent* of it

*makes known to the adverse party sufficiently in advance of the trial* or hearing *to provide* the adverse party with *a fair opportunity to prepare to meet it, his intention to offer the statement* and the particulars of it, including the name and address of the declarant." (Emphasis added.)

Rule 804(b)(6) was a catchall provision which, when proposed for adoption as federal Rule 804(b)(5), encountered considerable opposition.

"The House Judiciary Committee proposed to delete the provision altogether, along with identical language which the Advisory Committee had proposed in Rule 804(b)(5). The accompanying Committee Report reflects the concern that these catchall provisions inject 'too much uncertainty into the law of evidence' and impair 'the ability of the practitioners to prepare for trial.' " (Footnotes omitted.) 4 Louisell and Mueller, Federal Evidence § 437 at 463.

Courts have generally noted that Congress intended rigid enforcement of the notice requirement and have refused admission of hearsay evidence pursuant to Rule 804(b)(5) where reasonable notice of intent to offer the hearsay was not given. *United States v. Rodriquez,* 706 F.2d 31, 41 (2nd Cir. 1983); *United States v. Atkins,* 618 F.2d 366, 372 (5th Cir.1980). The giving of notice has been excused in cases in which the proponent of the hearsay was not at fault. *United States v. Bailey,* 581 F.2d 341 (3rd Cir.1978). We find appellee at fault in this case for, as the court noted, the appellee had interviewed these witnesses and had available all of the proposed evidence nine months before trial.

Appellant objected to the receipt of the proposed hearsay testimony noticed in the letter of April 30, 1984, stating the notice was too late, did not satisfy the requirements, spirit or intent of the rule, and did not afford him a fair opportunity to prepare to meet it. Appellant's objection was overruled, and Kay Schmunk's mother was permitted to testify that Kay Schmunk had returned to Michigan for a visit in October

1982—eight months prior to her death—and that during that visit Kay Schmunk had said that things were not going well, she wanted to come back home, and that she would be interested in purchasing a home that would be just right for her and Billy.

She testified further that Kay Schmunk told her in a telephone conversation during February 1983 that she and Billy were going to come home and wanted to live in a travel trailer that was available; that things had gotten impossible and she wanted to come back home; she then stated that Bob was coming down the driveway and she had better hang up.

Finally, she testified pursuant to the April 30 notice that Kay Schmunk stated to her at a family reunion in Michigan during June 1983 that she would have gone crazy in Wyoming without the right-to-life movement and that she was going back to Wyoming and then coming back to Michigan for a "long vacation." It was said that meant she was coming home to stay.

As we have said, hearsay evidence is not ordinarily admissible. If it is to be admitted pursuant to an exception to the hearsay rule, compliance with the requirements of that rule is necessary. There is not a sufficient excuse to justify the late notice in this case. The witnesses had been interviewed nine months before trial. Their proposed testimony was or should have been known to the State of Wyoming. The proposed hearsay generally covers a substantially different period of time from that noticed on April 25, 1984. Finally, its receipt was extremely damaging to appellant as we will discuss later. He should have had a fair opportunity to prepare for and meet it. The proposed hearsay should have been excluded when appellant objected to it being received, and it was error not to do so.

### ADMISSION OF HEARSAY STATEMENTS NOTICED APRIL 25, 1984

 Appellant further complains that all of the hearsay statements of Kay Schmunk admitted into evidence, i.e., both those noticed April 25, 1984, and those noticed April 30, 1984, should have been excluded. We note here that although appellant objected to the statements noticed April 30, 1984, he did not object to the receipt of the hearsay statements of Kay Schmunk noticed April 25, 1984. Appellant seems to contend that an objection was unnecessary claiming that the State has the initial burden of establishing a foundation for the admission of this hearsay. In *Hopkinson v. State*, Wyo., 632 P.2d 79, 131 (1981), we said:

"[I]n order for hearsay to be admissible under the catchall exception [referring to Rule 804(b)(6), W.R.E.], *certain requirements must be satisfied.* First, the declarant must be unavailable. Second, the adverse party must either have been given pretrial notice or a sufficient opportunity to prepare for and contest the admission of the hearsay. Third, the truth of the matter asserted must be evidence of a material fact. Fourth, the hearsay statement must be more probative than any other evidence which could be procured through reasonable efforts. Fifth, and finally, the statement must be supported by circumstantial guarantees of trustworthiness * * *."

We further said that additional limits imposed upon the admission of hearsay by the Confrontation Clause of the Sixth Amendment to the United States Constitution and § 10, Article 1 of the Wyoming Constitution must also be satisfied, these requirements being that:

"It is our conclusion that, before hearsay becomes admissible, the Confrontation Clause *imposes a burden* upon the State in addition to those found under Rule 804(b)(6). The prosecutor is required to establish: (1) that the declarant is unavailable to appear at trial; and (2) that there exists sufficient background information concerning the circumstances under which the hearsay statement was made to provide the jury with an adequate basis to evaluate its veracity." 632 P.2d at 132–133.

We said in *Hopkinson v. State*, supra, that the State has the burden of proving the existence of the five elements listed and providing sufficient background to satisfy the Confrontation Clause. Appellant suggests that the State must satisfy its burden and the court make a determination of admissibility even though appellee makes no objection to receipt of the hearsay evidence. Appellant is not correct in this contention. To hold as suggested would impose an impossible burden upon a trial court to, on its own motion, require proof that opposing counsel has not demanded. Besides, opposing counsel may choose not to object to receipt of the offered evidence for many reasons. Trial strategy may dictate no objection; the opposing party may believe the offered evidence will be favorable; the opposing party may believe that impeachment may be more damaging and choose not to exclude the evidence. Rule 103, W.R.E., with respect to admissibility of evidence provides:

"(a) Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, *and*

"(1) In case the ruling is one admitting evidence, *a timely objection* * * * *appears of record* * * *.

* * * * * *

"(d) Nothing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the court." (Emphasis added.)

 There was no objection to the proposed hearsay identified in the April 25, 1984 notice. In the absence of an objection, the erroneous admission of this hearsay must rise to plain error before it will be considered by this court. It has been said:

"The term [plain error] suggests obviousness, and most of the defining phrases include this element. Most of the attempted definitions also suggest that plain error is something more fundamental or serious than reversible error * * *. As a practical matter, however, it is not clear how much more serious an error must be than reversible error in order to merit plain error treatment, nor how to determine whether a given error is more serious than reversible error, for the decisions finding plain error reflect little more than the conclusions reached by the court, and the attempted definitions are probably best viewed only as general indicators of the nature of the inquiry.

* * * * * *

"A determination of plain error will be made upon examination of the whole record. Imagination is required in reliving the trial and assessing the effect of the asserted error, and each decision will turn upon the facts in a particular case." 1 Louisell & Mueller, Federal Evidence § 21 at 119–124.

In *Bradley v. State*, Wyo., 635 P.2d 1161, 1163–1164 (1981), we said:

"A failure to object constitutes a waiver of whatever error occurred, unless the error rises to the level of plain error. A three-part test has been established for determining whether an error may achieve the status of plain error. First, the record must be clear as to the incident which is alleged as error. Second, the party claiming that the error amounted to plain error must demonstrate that a clear and unequivocal rule of law was violated. Finally, that party must prove that a substantial right has been denied him and as a result he has been materially prejudiced."

 Rule 804(b)(6), supra, requires that the proposed hearsay statements be "evidence of a material fact." Appellant contends that the proffered hearsay statements of Kay Schmunk were not evidence of a material fact and, therefore, not admissible. The material fact requirement is satisfied if the proposed hearsay statement offered into evidence is relevant. 4 Louisell and Mueller § 491 at 1202.

Relevant evidence is

"evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it

would be without the evidence." Rule 401, W.R.E.

Evidence which is not relevant is not admissible, Rule 402, W.R.E. Of course Kay Schmunk's state of mind is no more relevant nor material in this case than was the state of mind of Vincent Vehar in *Hopkinson v. State,* supra, where we said:

> "[T]he mental state of Vincent Vehar prior to his death is irrelevant. There is no allegation by the defense that his death was suicide or in any other manner which would make his mental state an issue." 632 P.2d at 130.

It is Dr. Schmunk's state of mind with which we are concerned in this case. If Kay Schmunk's hearsay statements had an effect in some manner upon Dr. Schmunk's actions, motive, or purpose, it might satisfy the materiality requirement. But in this case not a single witness testified that Dr. Schmunk was aware that Kay Schmunk had thought of leaving Douglas nor was there, during the preceding eight months, any overt act or other evidence that might put Dr. Schmunk on notice of Kay Schmunk's alleged intention. Billy Duncan, who resided with Robert and Kay Schmunk at the family home and testified to all facets of their family life, stated that from what he knew, "she did not tell him that she was going to leave." Unless the evidence was such that Kay Schmunk was going to leave appellant and return to Michigan, and that appellant knew of this, the evidence was not of a material fact, for how could Kay Schmunk's secret intentions affect appellant's action or be relevant upon the question of motive? Thus, the evidence under the present state of the record did not satisfy the material fact requirement for admission as hearsay under the catchall exception.

With respect to its admission being plain error, the record is clear as to the incident alleged to be error. Appellee, in its notices of April 25 and April 30 stated:

> "These are all statements relating to the declarant's state of mind and her intent or plan to get out of Douglas, if she could, and her dissatisfaction there."

As we have said, declarant's state of mind was not an issue nor a material fact in this case. A clear and unequivocal rule of law was violated in that the hearsay was not of a material fact and, therefore, was not admissible under the exception provided in Rule 804(b)(6), W.R.E. The admission of this hearsay denied appellant a substantial right.

Appellee offered considerable evidence with respect to these hearsay statements. The evidence is extensive, appears to be complete, and there is nothing from which we can say, even by inference, that it was of a material fact. We hold, therefore, that it was plain error to admit the April 25th noticed hearsay statements pursuant to the catchall exception found in Rule 804(b)(6), W.R.E.

Appellee contends finally that the hearsay statements of Kay Schmunk were admissible under the provisions of Rule 803(3), W.R.E., which provide:

> "The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

> \* \* \* \* \* \*

> "(3) A statement of the declarant's then-existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will."

The State, thus, contends that because the hearsay was admissible under Rule 803(3), W.R.E., supra, it was unnecessary that the State satisfy the pretrial notice requirements of Rule 804(b)(6), W.R.E., supra. The state-of-mind exception provided in Rule 803(3), supra, permits hearsay to be introduced as proof of the state of mind of the person making the hearsay statement. The state-of-mind exception concerns the declarant's mental condition and ordinarily may be received if that is the matter ultimately to proved by the statements. 4 Louisell and Mueller § 440 at 518. Thus:

"When a declaration is used to evidence a state of mind directly in issue, one encounters little difficulty in justifying the admission of the declaration. State of mind has to be proved in some way and frequently other evidence is non-existent or inadequate.

"The declarant's state of mind may be an issue in a wide variety of contexts. Statements may be admitted, for example, to show: intent to establish a particular domicile, a customer's reason for refusing to deal with a supplier, motive, competency, affection or alienation * *." 4 Weinstein & Burger, supra, at 803–111.

Ordinarily, declarant's state of mind is not evidence of the state of mind of a third person. As here, the state of mind of the declarant, Kay Schmunk, was not evidence of the state of mind of appellant, and it was not admissible under the provisions of Rule 803(3), W.R.E., supra.

In *Alcala v. State*, Wyo., 487 P.2d 448, 455 (1971), cert. denied 405 U.S. 997, 92 S.Ct. 1259, 31 L.Ed.2d 466 (1972), we said:

"[I]n marital homicide cases any fact or circumstance relating to ill-feeling, ill-treatment, jealousy, prior assaults, personal violence, threats, or any similar conduct or attitude by the husband toward the wife [victim] are relevant to show motive and malice in such crimes."

The hearsay statements of Kay Schmunk did not concern appellant's attitude toward her. The statements did not concern appellant's attitude, feelings or state of mind at all. At best, they were evidence of Kay Schmunk's state of mind not that of appellant's. As such, they were inadmissible.

## THE ARGUMENT AND FAIR TRIAL

The prosecutor in his opening statement, after telling the jury that Kay Schmunk enjoyed the status and elegance of being a doctor's wife in what appeared to be a happy marriage, stated:

"Ladies and gentlemen, there will be a dark counter-current to all of this. The real story. * * * [What] we are going to present is what was known to the family members and what appeared from time to time on the surface of the marriage, this dark counter-current * * *.

* * * * * *

"We have the three of them living alone in their underground home.

* * * * * *

"Why did he kill her? * * * [I]t's not important as to guilt or innocence. It has nothing to do with it, but there is a motive.

"Remember, motive is a fun thing to play with in the back of your heads.

"I want you to listen for it. I want you to hear the bits and pieces. *I'm not going to tell you what it is now. I'll tell you what I think it is in closing.*" (Emphasis added.)

During examination of the State's witnesses, the prosecutor suggested possible motives. He insinuated that Dr. Schmunk bought a rifle for his girlfriend. He suggested that Dr. Schmunk killed for money, property or the proceeds of an insurance policy. Witnesses testified that Kay Schmunk was planning to leave. Witnesses stated that they believed Dr. Schmunk had killed Kay Schmunk. Then, in closing argument, the prosecutor told the jury, "I don't think there is a girlfriend." He said he had not proven that the killing was for money or for revenge or because of jealousy. Then, as promised in his opening statement when he said "I'll tell you what *I think* it is in closing," he said it was his belief that Dr. Schmunk killed his wife because he was a man with a mysterious dark side, a split personality, who because of some mental aberration, "put to sleep what was real and imperfect."

Appellant contends that the State lifted this theory of the case from a movie, stating in his brief:

"In the classic 1946 film, *The Spiral Staircase,* the mystery behind a series of senseless, apparently motiveless, murders is solved for the audience when it is discovered that the murders are not unrelated. Connecting them, explaining them, was the sick logic of their perpetrator, a seemingly gentle professor

whom no one would suspect of murder. As he tries to kill the mute girl who attends his invalid mother, the man admits that he is driven by a demented calling. It is not profit that spurs him to murder, nor revenge, nor jealousy: he hates imperfection in the world, and he will kill to eliminate it."

The manner in which the State arrived at a theory of the case does not concern us as much as the necessity that there be evidence to support the theory. Here there was none. Not a single witness testified that Dr. Schmunk had a "split personality," that there was a dark, mysterious side to him or that he was sick or demented. It was contended, nevertheless, that there was evidence from which inferences could be drawn which would support the argument.

We recognized that the prosecuting attorney may draw all legitimate inferences from the evidence when we said:

"Closing arguments are meant to be just that, arguments premised upon the evidence already submitted to the jury. Prosecutors are no more limited in their closing than defense counsel. *They may review the evidence and suggest to the jury inferences based thereon.* The purpose of closing arguments is to allow counsel to offer ways of viewing the significance of the evidence. However, there are limits, not only on prosecutors, but on all attorneys." (Citations omitted.) *Browder v. State*, supra, 639 P.2d 889, 893. See also, *Hopkinson v. State*, supra, 632 P.2d at 145; 75 Am.Jur.2d Trial § 337.

We look to see if there was evidence from which the jury could infer that there was a dark, mysterious side to Dr. Schmunk and that he was a man with a "split personality" who could not accept, and therefore killed, what was imperfect.

Perhaps that inference could be drawn from the charge by his daughter against Dr. Schmunk in the state of Michigan. The jurors knew that the prosecutor had information about something occurring in Michigan, but they were never told what it was.

When the prosecutor said "I think he did it because this man has got two diametrically opposed personalities," the jurors could not help but wonder whether the source of the prosecutor's information was this unknown Michigan matter. But we have held it error to have admitted this evidence.

Perhaps when the jury learned that he refused, under all circumstances, to take a lie detector test, such inference might be drawn. But we have held it error to have admitted that evidence.

Perhaps when Billy said he suspected Dr. Schmunk of having killed his mother, that would support an inference of his "dark side." But it was error to admit that evidence.

And, when Mrs. Schmunk's relatives testified that Kay was leaving him to return to Michigan, the jury might infer that she was leaving because of his dark, mysterious side; but that evidence we have held also inadmissible.

The above evidence was admitted and was before the jury at the time of argument. The prosecutor could not know that it would later be held by us to have been erroneously admitted. Where improperly admitted hearsay evidence is commented upon in argument, it "cannot be said to be improper because it was based on the evidence [citation] but seriously aggravated the error committed in admitting the evidence." *State v. Perelli*, 125 Conn. 321, 5 A.2d 705, 707, 121 A.L.R. 1357 (1939). Perhaps his argument was proper at the time, although we doubt that this evidence would support an inference that Dr. Schmunk had a "split" or "dual" personality and, therefore, killed what was imperfect.

It is generally held that an expression of knowledge, opinion or belief, not based upon or shown by the evidence at trial, either expressly or inferentially is improper and prejudicial error. 75 Am.Jur.2d Trial § 261; 50 A.L.R.2d 773. The policy and reasons for the rule

"are that the statement complained of injects into the case irrelevant and inadmissible matter or a fact not legally pro-

duced in evidence, and adds to the probative force of the testimony adduced upon the trial the weight of the prosecutor's personal influence or knowledge, or of his professional opinion, or the influence of his official position." (Footnotes omitted.) 75 Am.Jur.2d Trial § 261.

■ There was no other evidence from which these inferences could be drawn or which would support the argument of the prosecutor. The prosecuting attorney is the representative of the state of Wyoming. Thus we have said:

"The role of the prosecuting attorney in a criminal case 'differs from that of the usual advocate; his duty is to seek justice, not merely to convict.' ABA Code of Professional Responsibility, EC 7–13 (1980)." *Browder v. State*, supra, 639 P.2d at 893.

And, in *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935), the court said a state is the representative of

"a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

"It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none."

Appellant did not object to the prosecutor's argument. An objection, however, is not necessary where the transgression is plain error. In *Browder v. State*, supra, 639 P.2d at 895, we said:

"In determining whether plain error has occurred, the facts of the case must be viewed in light of the trial record as a whole and not as to whether any one single incident standing alone would be reversible. *United States v. Grunberger*, 431 F.2d 1062 (2nd Cir.1970). This *cumulative-effect approach* has been applied in numerous cases. In particular, it was used by the United States Supreme Court in *Berger*, supra.

"Reviewing the entire record in this case, it is clear that the *fairness* of appellant's trial was called into question by the prosecutor's conduct." (Emphasis added.)

■ We have previously discussed the doctrine of plain error. The cumulative effect of error in admission of evidence and testimony utilized in the prosecutor's argument and the argument itself makes clear that it was plain error.

■ We believe that sending the edited videotape to the jury room with Dr. Schmunk's adamant refusal to submit to a lie detector test and the admission of the hearsay statements of Kay Schmunk were prejudicial error in themselves sufficient to require reversal. We are convinced that the cumulative effect of putting before the jury inadmissible evidence of an unknown charge against Dr. Schmunk from Michigan, his refusal to take a lie detector test, testimony of witnesses that they "suspected" Dr. Schmunk had killed Kay Schmunk, testimony of Kay Schmunk's uncommunicated thoughts of leaving Dr. Schmunk, and then capping it all with the argument here presented, was to deprive Dr. Schmunk of a fair trial. Thus, our deep and abiding conviction that loyalty to our constitution and its provisions guaranteeing to everyone a fair trial, requires reversal of this case.

## THE DISSENTS

It is patently obvious that there is much serious disagreement between the majority and the dissenting justice. Upon one critical point, however, there is plain and clear agreement. Thus, it is stated in one of the dissents that with reference to

"the unfairness which results from a jury viewing a video tape in the jury room and, thus, giving undue emphasis to a portion of the testimony, I agree. I believe that this Court should, by rule, direct that any verbatim record of question-and-answer testimony, video tape or deposition, or otherwise, whether admitted as an exhibit or otherwise, shall not be subject to jury inspection other than as permitted to be read or shown during that part of the trial in which evidence is being received."

It is then stated that although "unfair," it was all right for the videotape, with appellant's refusal to submit to a polygraph test, to go to the jury room in this case for two reasons.

First, it is said there was no objection by appellant. We disagree. In chambers, *before the tape went to the jury room,* the following occurred. Appellant's counsel stated:

"Judge, I * * * move for a dismissal in the matter by virtue of the prejudicial effect [of] the video tape. * * * [T]he Doctor indicated on that video that he would not take a polygraph, and the reason for him not taking a polygraph was as a result of a matter that had occurred with respect to his daughter, or charge by his daughter * * *."

The purpose of an objection is to give notice of the claimed error so that the judge has an opportunity to rule or correct the error. It cannot be claimed here that there was no such notice. Appellant made a motion in limine before trial, and, during trial, moved for dismissal and for mistrial. Surely these motions gave notice to the court and preserved for review appellant's objection to the videotape because it contained, as he stated, the doctor's statement "that he would not take a polygraph." But

even if that were not so and there were no objection, we would hold it plain error to send the videotape to the jury room.

Second, it is said there was no rule in effect concerning sending a transcript of part of the testimony to the jury room. Again, we disagree. The rule against sending testimony to the jury room is as ancient as the common law itself. The reason for the rule is obvious. Having some testimony to read again and consider and discuss in deliberations, the jury is likely to unduly emphasize that testimony over that which was heard days before and which may have begun to fade from memory. The impact of visual and oral testimony on videotape is even greater. As the dissenting justice states, it is "unfair" and should not be "permitted."

In *State v. Wilson,* 188 Kan. 67, 360 P.2d 1092, 1098 (1961), quoting from *State v. Solomon,* 96 Utah 500, 509, 87 P.2d 807, 811 (1939), the court, after noting that permitting exhibits to go with the jury was committed to the court's discretion, stated:

" 'But the testimony of a witness is in a different category. Such is the provision of the statutes and the common law always excluded depositions and written testimony from being carried from the bar by the jury. We can see no reason why the court should depart from the well established rule. It may often happen that the testimony on one side is oral from witnesses produced before the jury, while the testimony for the other side on essential matters is in the form of depositions or in the transcript from testimony at a previous hearing. If the hearing lasts for any length of time and the jury takes the depositions or transcript to be read and discussed while the oral evidence contra has in a measure faded from the memory of the jurors, it is obvious that the side sustained by written evidence is given an undue advantage. The law does not permit depositions or witnesses to go to the jury room. Why should a witness be permitted to go there in the form of written testimony? *State v. Moody,* 18 Wash. 165, 51 P. 356;

*Welch v. Insurance Company,* 23 W.Va. 288; *Tabor v. Judd,* 62 N.H. 288.'"

The Kansas court then, in *State v. Wilson,* supra, reversed a conviction for kidnapping and forcible rape stating

"that when the court permitted the jury to take to the jury room the transcript of Connie Porting's evidence and to keep such transcript throughout almost all of their deliberation, such action placed undue emphasis on her testimony; in fact, it was equivalent to sending the complaining witness into the jury room, where she continued to plead her cause." 360 P.2d at 1099.

We suggest that sending the videotape with appellant's adamant refusal to submit to a polygraph to the jury room for viewing was sufficient in itself to require reversal. We presume it was for the purpose of being viewed again, otherwise there was no reason for the court to send it to the jury room.

We note finally the multitude of errors reviewed in one of the dissents. Even if some must be considered under the plain-error doctrine, it would seem to establish that their cumulative effect deprived appellant of a fair trial.

Reversed.

BROWN, Justice, concurring.

I agree that this case must be reversed.

In the last paragraph of the majority opinion, reference is made to cumulative error. It seems that the doctrine of cumulative error, in simple terms, is that several small errors add up to a big error; and while none of the small errors standing alone is sufficient for reversal, the sum of the small errors becomes substantial mandating reversal. I have a continuing problem with the nebulous doctrine of cumulative error and do not believe it has application here. The errors in this case, standing alone, are sufficient to justify reversal without resorting to cumulative error.

ROONEY, Justice, dissenting, with whom THOMAS, Chief Justice, joins.

The majority opinion addresses and finds error in four of the eight issues presented by appellant on appeal. It finds no one of these errors to be sufficient for reversal, but that

"* * * several errors occurring during the course of trial, when considered together, created sufficient prejudice to deprive appellant of a fair trial. * * *"

I believe this to be a dangerous precedent, particularly in recognition that an objection was not made to that upon which most of the issues in this case are based. The trial court was thus not given an opportunity to consider the alleged errors. We should not expect the trial court to assume the role of presenting the case for the parties by correcting errors not brought to its attention by the parties, and also not expect the trial court to keep score of possible errors in an effort to gauge when they have accumulated to the point of becoming unfairly prejudicial.

We start with Rule 103, W.R.E., which provides in pertinent part:

"(a) *Effect of erroneous ruling.*—Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and

"(1) Objection.—In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context; * * *

* * * * * *

"(d) *Plain error.*—Nothing in this rule precludes taking notice of plain errors affecting substantial rights although they were not brought to the attention of the court."

The rule does not address error as arising from an accumulation of nonerrors.

Plain error is again addressed in Rule 49(b), W.R.Cr.P.:

"Plain errors or defects affecting substantial rights may be noticed although

they were not brought to the attention of the court."

We have said that the plain error rule is to be exercised cautiously and only in exceptional circumstances. *Ketcham v. State*, Wyo., 618 P.2d 1356 (1980); *Leeper v. State*, Wyo., 589 P.2d 379 (1979); *Downs v. State*, Wyo., 581 P.2d 610 (1978). The defendant has the burden to show plain error. *Campbell v. State*, Wyo., 589 P.2d 358 (1979). It must do so more than in an arguable way, and a mere allegation of prejudice is not sufficient to meet such burden. *Scheikofsky v. State*, Wyo., 636 P.2d 1107 (1981).

The Wyoming case cited by the majority opinion to validate cumulative errors as a basis for reversal concerns the cumulation of the *same* activity, and not a cumulation of separate activities. In that case, *Browder v. State*, Wyo., 639 P.2d 889 (1982), the cumulation was repeated acts and conduct of the prosecutor.

In any event, I cannot agree that reversible error exists with reference to the issues on appeal. Addressing these issues:

## I. TESTIMONY CONCERNING MRS. SCHMUNK'S STATEMENTS AS HEARSAY

On April 25, 1984, notice was given pursuant to Rule 804(b)(6), W.R.E.,[1] that deceased's mother, sister and brother would testify to separate statements made to each of them by deceased in April and June 1983 concerning her intention to leave appellant. A similar notice was given on April 30, 1984, with reference to testimony to be given by deceased's mother to similar statements made to her by deceased in October 1982, February 1983, and June 1983.

Appellant does not contend that the April 25, 1984, notice was not timely; no objection was made to it. But, he contends that the April 30, 1984, notice was not timely. The purpose of the notice, as reflected in the rule, is to give "the adverse party * * * a fair opportunity to prepare to meet" the evidence. There is no contention that appellant did not here have sufficient time to meet the evidence referred to in the April 25, 1984, notice, and in fact he did meet it at trial. The evidence noticed on April 30, 1984, was similar to that noticed on April 25, 1984, and it too was met at trial. Adequate notice was thereby evidenced, and there was no error in admission of the evidence on this ground.

But, the majority opinion finds the statements to be irrelevant, in any event, since they pertain to the deceased's state of mind, not that of appellant; and since there was no evidence to reflect that the deceased's intention to leave was communicated to appellant, the testimony was irrelevant. However, the majority opinion overlooks the relevancy of the statements in another context; i.e., to meet the defense theory that the marriage of the deceased and appellant was a happy one and that the death was an accident.[2] The appellant, through his testimony regarding a happy marriage, sought to prove the death accidental and not intentional. Evidence to disprove such and to attack appellant's credibility—to impeach him—ought to be equally available to the prosecution. Of

---

**1.** Rule 804(b)(6), W.R.E., provides as an exception to the hearsay rule:

"A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general pruposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a state-

ment may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant."

See *Cutbirth v. State*, Wyo., 663 P.2d 888 (1983).

**2.** First-degree murder would not be established in the absence of intent or malice. The jury was also instructed on the elements of voluntary manslaughter.

note is the fact that the testimony of William (Billy) Duncan (see ante) concerning the same matter (public appearance of a happy marriage but privately otherwise) was admitted without objection.

The notice regarding this testimony was obviously sufficient, and the testimony was relevant for the purpose indicated. The admission of it was not error.

## II. CHILD'S TESTIMONY THAT HE LEFT DOUGLAS "BECAUSE OF THE SUSPICIONS OF MY FATHER KILLING MY MOTHER"

Again, the majority opinion forgot to hit the ball before starting to run around the bases. That opinion improperly considers the answer to the question, "Why did you leave Douglas, Wyoming?" to have been "Because I had suspicions that my father had killed my mother." However, the answer given by William (Billy) Duncan, the child of appellant and deceased, was "Because of the suspicions of my father killing my mother." The answer was plain. His father had been accused of the crime of killing his mother. The atmosphere in Douglas reflected such "suspicions." The venue of the action was changed because of them. It isn't surprising that the child was uncomfortable in Douglas with them. His activity in Douglas must have been affected because of the "suspicions." He left Douglas because of these suspicions in the community, and he so answered the question. He did not say "I left because I thought my father killed my mother." He said he left "Because of *the* suspicions of my father killing my mother." (Emphasis added.) This being so, the discussion of this issue in the majority opinion is not pertinent.

Additionally, the trial objection to the question was not to its relevancy. The late objection made to this issue was that the

question was "leading and suggestive." Error cannot be predicated on the trial court's ruling if the specific objection is not brought to its attention. *Lee v. State*, Wyo., 556 P.2d 217 (1976); *Martinez v. State*, Wyo., 511 P.2d 105 (1973). Any error alleged to be founded on relevancy would have to be plain error to be reversible. Reversible error does not exist with reference to this issue.

## III. PROSECUTOR'S CLOSING ARGUMENT

The majority opinion is critical of the prosecution's reference to the potential of appellant having two characters or appearances—a double attitude, one, that given to the public relative to his happy marriage; and two, the dark side being that given privately at home as testified by witness Duncan and by the testimony referred to supra in the section entitled "Testimony Concerning Mrs. Schmunk's Statements as Hearsay." There was no objection to the closing argument.

The majority opinion recognizes the propriety of the prosecution presenting its theory of the case to the jury, reviewing the evidence with the jury, and suggesting inferences based thereon. It also recognizes reversal can be predicated only if there is plain error when no objection was made to the closing argument. But it does not find the elements of plain error in the closing argument *except as cumulated with other alleged errors*, again citing and quoting from *Browder v. State* in support thereof. As already noted supra, the situation in Browder was entirely different and distinguishable from that in this case.

The elements for plain error do not exist for this issue.[3] The record is clear as to the incident, but the appellant has not proven a violation of a clear and unequivocal

---

**3.** The elements for plain error as quoted in the majority opinion from *Bradley v. State*, Wyo., 635 P.2d 1161, 1164 (1981), are:

"* * * First, the record must be clear as to the incident which is alleged as error. Second, the party claiming that the error amounted to plain error must demonstrate that a

clear and unequivocal rule of law was violated. Finally, that party must prove that a substantial right has been denied him and as a result he has been materially prejudiced. * * *"

See *Daellenbach v. State*, Wyo., 562 P.2d 679 (1977).

rule of law. The prosecutor was presenting his theory of the case and the facts in support thereof. In any event, there was no denial of a substantial right and no material prejudice. Such is the reason the majority opinion attempts to cumulate other alleged errors to arrive at reversible error.

## IV. ADMISSION AND USE OF VIDEO TAPE

There are three potential problems with the video tape: (1) reference to the Michigan incident; (2) reference to a previous polygraph test; and (3) reference to refusal to take a current polygraph test.

### Michigan Incident

The motion in limine was to preclude reference in the video tape to prior bad acts of appellant in Michigan in the presentation of the prosecution's case in chief. The motion was granted, but the video tape was not edited to delete the reference before it was shown to the jury. It was shown without objection. In fact, appellant stipulated to its admission into evidence. When the objecting motion was made the next day, the tape was edited before it went to the jury, and a limiting instruction was given to the jury:

"You are instructed that a certain portion of State's Exhibit 21, the same being a video tape recording, admitted into evidence has been deleted. You are therefore instructed that the deleted portion must not be considered by you as evidence."

In view of the passing reference to the Michigan charges, viz. "I had a polygraph taken in reference to my daughter's charges against me, which were totally erroneous," and inasmuch as juries are presumed to follow the instructions given to them, *Hursh Agency, Inc. v. Wigwam Homes, Inc.*, Wyo., 664 P.2d 27 (1983); *State Highway Commission v. Peters*, Wyo., 416 P.2d 390 (1966), there was no error—particularly plain error—in the court's ruling on admission based on this aspect of the video tape.

The cases cited in the majority opinion to support a holding that a limiting instruction is insufficient in such situation concern factual situations far more aggravated than here.

In *United States v. Brevard*, 739 F.2d 180 (4th Cir.1984), one of those cited in the majority opinion, repeated warnings were given to the witness to not refer to polygraph tests. At least three references were made to it after objections and warnings by the trial court. In exasperation, the trial court instructed the jury that the polygraph references had nothing to do with the case, and they were to draw no inferences from them. In reversing the conviction, the Fourth Circuit recited the general rule to be:

"* * * Where an impermissible reference to a polygraph has been interjected, the court usually may cure the error by striking the evidence and instructing the jury to disregard it. * * *" 739 F.2d at 182.

However, the repetition and aggravated nature of the references in the case were held to be sufficient to overcome the presumption. Objections were properly and promptly made, and the references were repeated and aggravated in *United States v. Brevard*, contrary to that in this case.

In *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), another of the cases cited in the majority opinion, the problem was the admissibility of a co-defendant's statement which implicated the defendant. The co-defendant was not available for cross-examination; it was a joint trial and there was a substantial threat to defendant's constitutional rights. The Supreme Court recognized the general rule thus:

"* * * Not every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoidable through limiting instructions; instances occur in almost every trial where inadmissible evidence creeps in, usually inadvertently. * * *" 88 S.Ct. at 1627.

The court found the facts of the case to provide an exception wherein the risk is

great that the jury cannot or will not follow the limiting instructions, and the consequences are vital to the defendant. The facts in this case do not start to match those in Bruton so as to warrant an exception to the general rule.

In the other case cited in the majority opinion, *Throckmorton v. Holt,* 180 U.S. 552, 21 S.Ct. 474, 45 L.Ed. 663 (1901), the essential holding was that the instruction was not clear on what part of the evidence was not to be considered by the jury, and that the uncertainty did not result in a clear direction to not consider the evidence; i.e., the result was that there was no withdrawal of evidence from jury consideration, not that the withdrawal itself was insufficient to cure the error. The court did note the general rule that withdrawal of evidence cures any error in its admission, but that there may be instances where such a strong impression is made by the evidence that withdrawal will not erase it. In Throckmorton, there were several witnesses involved in the questioned evidence and long argument concerning its admissibility. Such aggravations do not exist in this case.

The limiting instruction in this case was well within the general rule with reference to the Michigan incident.

### Previous Polygraph Test

That said in the previous subsection of this dissent with reference to a limiting or curing instruction relative to the Michigan incident is equally applicable to that relative to the previous polygraph test. The portion of the tape was deleted and the jury was instructed to disregard the deleted part.

The majority opinion discusses making the *results* of the test known to the jury, and it cites cases relative thereto. Certainly there is no suggestion that the results of the Michigan polygraph case were made known to the jury, and discussion concerning such is misplaced. If such discussion is founded upon the statement of appellant that "I had a polygraph taken in reference to my daughter's charges against me, *which was totally erroneous"* (emphasis added), not only are the words "which was totally erroneous" improperly taken to modify and apply to the results of the polygraph test instead of modifying and applying to the more recent words in the sentence, "charges against me," but such interpretation would make the comment to be gratuitous, and any error of the type here alleged would be invited error.

> "The doctrine of 'invited error' embodies the principle that a party will not be heard to complain on appeal of errors which he himself induced or provoked the court or the opposite party to commit. * * * *" 5 Am.Jur.2d Appeal and Error § 713 (1962).

The doctrine has long been recognized in Wyoming:

> "It is a general rule that an error to be available on appeal must have occurred without the express or implied consent of the appellant. * * * *" *Schloredt v. Boyden,* 9 Wyo. 392, 403–404, 64 P. 225 (1901).

### Refusal to Take a Current Polygraph Test

The motion in limine was not based upon the refusal to take a current polygraph test. Nor was an objection made at trial. After the tape was played to the jury and when appellant finally objected, and although the refusal to take a current test was mentioned, the thrust of the objection was to the inclusion therein of the Michigan incident and, perhaps, with the polygraph taken in connection therewith. The objection was:

> "* * * I think that the implication is very clear by virtue of the video tape and the particular portion which had to do with a polygraph where, number one, the Doctor indicated on that video that he would not take a polygraph, and the reason for him not taking a polygraph was as a result of a matter that had occurred with respect to his daughter, or charge by his daughter, which gave a clear indication that he had previously been charged with some criminal activity; that

he had been offered a polygraph and had presumably taken a polygraph."

" * * * Error may not be assigned unless objection has been made thereto with a distinct statement of the matter to which objection is made and the grounds for this objection, and indicating with definiteness and particularity the error asserted * * *." *Texas Gulf Sulphur Company v. Robles*, Wyo., 511 P.2d 963, 968 (1973).

Accordingly, there can be no question but that reversal on this ground can be only for plain error. The elements for plain error are set forth in note 3, supra.

It must be emphasized in this connection that not only was no objection made with reference to admission of the refusal to take the current test, but its admission was actually stipulated to by appellant. The motion in limine had to do only with the Michigan incident and perhaps the Michigan polygraph.

Accordingly, the application of the plain error rule requires even more caution in this instance wherein the evidence was admitted on stipulation. Again, the potential for invited error is exceedingly great.

Although I believe the foregoing is dispositive of this issue, I comment on two considerations relative thereto. First, the question relative to the existence of error in admission of testimony concerning the willingness of a defendant to take a polygraph test is not only presented in cases in which he refused to do so, but often the defendant seeks to evidence the fact that he was willing to do so. Second, cases can be cited to reflect instances in which it was held to be reversible error to admit the testimony, and cases can be cited to the contrary. Cases can be cited wherein any such error was cured by an instruction, and cases can be cited wherein it was not. See Annotation: Propriety and prejudicial effect of comment or evidence as to accused's willingness to take lie detector test. 95 A.L.R.2d 819 (1964).

The majority opinion cites and quotes from three cases to support the contention that *any* admission or reference to refusal to take a polygraph test is prejudicial and, thus, reversible error. The precedent is not that clear-cut, as reflected in the A.L.R.2d annotation, supra.

In *State v. Emory*, 190 Kan. 406, 375 P.2d 585 (1962), one of the cases referred to in the majority opinion, the court found that admission of a refusal to take the test was reversible error, distinguishing the facts of the case from those in *State v. Smith*, 187 Kan. 42, 353 P.2d 510 (1960), in which the jury was admonished, and reversible error was not found. In a later case, *State v. Roach*, 223 Kan. 732, 576 P.2d 1082 (1978), the Kansas court held that not only the admission of evidence that defendant submitted to a polygraph test was not reversible error, but the results thereof admitted into evidence were not reversible error *in view of a stipulation* of the parties to admit the same.

In *State v. Driver*, 38 N.J. 255, 183 A.2d 655 (1962), cited in the majority opinion to hold that "reference by the prosecutor to a refusal of the accused to take a lie detector test required reversal," there was much more than a mere "reference by the prosecutor." In his opening statement, the prosecutor made a number of references to the refusal to take the test. Portions of defendant's mother's taped statement were played to the defendant, and after each segment, defendant was asked to take a polygraph test. The prosecution emphasized the refusal to do so saying " 'every time he refused.' " At least four witnesses testified to interrogation of defendant, and when it came time for them to testify that he was asked to take a polygraph test and refused, they testified that " 'I am not supposed to mention that' " or a similar response. During the trial the prosecutor made "numerous" references to the question and answer which could not be mentioned. The court concluded that "[t]he entire handling of the lie detector test aspect of the case clearly reveals prejudicial overzealousness on the part of the prosecution, and leaves an appellate court with no recourse but vacation of the conviction." The case does not stand for the proposition

that "reference by the prosecutor" requires reversal.

In *Mills v. People*, 139 Colo. 397, 339 P.2d 998 (1959), the refusal to take the test was offered *over objection* as evidence " 'of guilt similar to evidence of flight.' " Obviously, such was not the purpose of the comment made by appellant on the video tape which was accepted into evidence pursuant to a stipulation and without objection.

In summary, then, I believe that whether or not a reference to the refusal or to the willingness to take a polygraph test is reversible error will depend on the circumstances of each case, with factors such as the emphasis given to it, the manner in which the reference occurred—intentionally or inadvertently—nonresponsive to a question, invited error, through stipulation, etc., whether or not the other evidence of guilt is exceedingly strong or exceedingly weak, and similar considerations. The same approach should be used in each case to determine if a limiting instruction, if one was given, was sufficient to cure the error, if error there was.

In this case, the stipulation for admission, the manner in which the reference occurred, and the strength of other evidence should not make reversible error.

Finally, with reference to the comment in the majority opinion concerning the unfairness which results from a jury viewing a video tape in the jury room and, thus, giving undue emphasis to a portion of the testimony, I agree. I believe that this Court should, by rule, direct that any verbatim record of question-and-answer testimony, video tape or deposition, or otherwise, whether admitted as an exhibit or otherwise, shall not be subject to jury inspection other than as permitted to be read or shown during that part of the trial in which evidence is being received.

However, such a rule was not in effect in this case. There is not even an allegation that the jury viewed the video tape in the jury room, let alone evidence that such was done. There was no objection to the video tape being available for jury inspection. In fact, it was stipulated that it be an exhibit. And the appellant does not make viewing in the jury room an issue on appeal.

I do not believe there is reversible error in the admission and use of the video tape in this case.

## V. THE FOUR ISSUES ON APPEAL NOT REACHED IN THE MAJORITY OPINION

I agree that the other four errors alleged by appellant will not warrant reversal.

### Dr. Graber's Testimony

Appellant contends that it was error to allow the emergency room physician who attended Mrs. Schmunk's death to testify that he would not prescribe narcotic drugs for his own family "[b]ecause I don't trust myself making therapeutic decisions about family members, and also it's too hard to get into an abusive matter."

Admission of evidence is within the sound discretion of the trial court, and its ruling thereon will not be reversed absent a showing of a clear abuse of discretion. *Hopkinson v. State*, Wyo., 632 P.2d 79 (1981), cert. denied 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982); *Apodaca v. State*, Wyo., 627 P.2d 1023 (1981); *Sanville v. State*, Wyo., 593 P.2d 1340 (1979).

> "A court does not abuse its discretion unless it acts in a manner which exceeds the bounds of reason under the circumstances. In determining whether there has been an abuse of discretion, the ultimate issue is whether or not the court could reasonably conclude as it did. An abuse of discretion has been said to mean an error of law committed by the court under the circumstances. * * * " *Martinez v. State*, Wyo., 611 P.2d 831, 838 (1980).

Simply stated, appellant has not made any showing of a clear abuse of discretion in this instance. His allegation in this respect is not supported by any authority.

### Refreshing Recollection of Appellant From Deceased's Medical Records

Appellant contends the court erred by refusing to allow appellant to refresh his recollection of deceased's medical history by reference to her medical records. The refusal was because the records had not been produced by appellant prior to trial in response to a discovery order which specifically included the records as items to be produced by appellant.

That said supra relative to the discretion of the court in ruling on an admission of evidence is applicable to the ruling of the court on this issue. The sanction here imposed is within the court's discretion. *Simms v. State,* Wyo., 492 P.2d 516, cert. denied 409 U.S. 886, 93 S.Ct. 104, 34 L.Ed.2d 142 (1972); Rule 18(h), W.R.Cr.P.

In any event, the entire medical history of the deceased was before the jury. Appellant testified as to deceased's complete medical history. Not only does appellant fail to show a clear abuse of discretion in the court's ruling, but he also does not demonstrate any prejudice from the ruling.

### Admission of Prosecution Evidence (1) Concerning Result Of Toxicologist Test As Found by Appellant's Expert, (2) From Witnesses Concerning Perceived "Personality Changes" Observed In Deceased, and (3) From Investigator Concerning His Reasons For the Investigative Procedures Used by Him

On cross-examination, appellant was asked if he had employed a toxicologist to review the findings of the prosecution's toxicologist. Appellant said that he did, and, on further examination, he acknowledged that his expert agreed with the findings and toxicology of the prosecution's toxicologist.

The testimony of some of the witnesses contained perceptions of "personality changes" observed by them in deceased. The pathologist testified as to the "theories" under which the autopsy was undertaken.

The investigator testified as to his reasons for interviewing various individuals and for taking certain actions, and as to that which he believed his investigation reflected when deceased died.

There was no objection to any of this testimony, and the issues relative thereto were first raised on appeal. As noted supra, even if error existed in the admission of such evidence, it can be considered on appeal only if it amounts to plain error. Since the admission of such testimony does not amount to plain error, the existence or nonexistence of error in its admission need not be considered.

The elements of plain error are set forth in note 3, supra. Certainly, appellant has not established the violation of a substantial right resulting in material prejudice. As noted in the cases cited supra, the plain error doctrine is to be exercised cautiously and only in exceptional circumstances. Appellant has the burden of showing plain error. The exceptional circumstances do not here exist, and appellant has fallen far short of establishing plain error.

The results of the toxicology tests were before the jury through the testimony of the State's toxicologist. The tests were conclusive. The fact that appellant's own toxicologist agreed with them is of no real importance, let alone being of material prejudice. If anything, the testimony simply went to the credibility of appellant's own testimony concerning the tests.

Likewise, the comments of witnesses concerning observed "personality changes" on the part of deceased were of little weight in context of that placed before the jury in this many-day trial. The pathologist's testimony concerning his "theories" was in truth a factual recitation of the manner and purpose of the autopsy. Again, appellant falls far short of his burden to establish plain error.

The investigator "walked through" the procedure taken by him in investigation of the matter. In doing so, appellant could possibly have objected to the words used. If such had been done, the meat of the testimony would undoubtedly have been

placed before the jury in a more precise and proper manner. The failure to object may have been with intent that the testimony not be emphasized or "cleaned up." In any event, considering the extensive testimony presented to the jury, I see no material prejudice from this piece of testimony. Applying the plain error rule cautiously, the decision that there was no plain error in this testimony is more than proper.

### Ineffective Assistance of Counsel

Appellant bases his allegation that he had ineffective assistance of counsel on the assumption that counsel did not properly object to certain evidence. Since I do not find any error with reference to the other issues on appeal, this allegation has no substance.

Counsel is presumed competent, and the standard upon which to gauge competency is "that which would reasonably be rendered by a reasonably competent attorney under the facts and circumstances of the case." *Hoskovek v. State*, Wyo., 629 P.2d 1366, 1367 (1981). The decision whether or not to object in any particular instance is a matter of trial strategy resting with the lawyer. *Hopkinson v. State*, Wyo., 664 P.2d 43, cert. denied 464 U.S. 908, 104 S.Ct. 262, 78 L.Ed.2d 246 (1983). Applying the following test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, reh. denied. —— U.S. ——, 104 S.Ct. 3562, 82 L.Ed.2d 864 (1984), there is no showing of ineffective assistance of counsel in this case.

> "The availability of intrusive post-trial inquiry into attorney performance or of detailed guidelines for its evaluation would encourage the proliferation of ineffectiveness challenges. Criminal trials resolved unfavorably to the defendant would increasingly come to be followed by a second trial, this one of counsel's unsuccessful defense. Counsel's performance and even willingness to serve could be adversely affected. Intensive scrutiny of counsel and rigid requirements for acceptable assistance could dampen the ardor and impair the independence of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client.

> "Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."

Also see *Murry v. State*, Wyo., 713 P.2d 202 (1986).

I would affirm.

THOMAS, Chief Justice, dissenting.

I join with Justice Rooney in his dissenting opinion. In the response to that dissenting opinion the majority opinion states that it presumes that the accused videotape was sent to the jury so that it might be viewed again in the course of the jury's deliberations. The record does not encompass any objection by the appellant to the videotape being furnished to the jury with the other exhibits nor does the record contain any indication that the jury did view it during the course of its deliberations. The appellant has the responsibility of furnishing a record upon which any issue can be decided. *Salt River Enterprises, Inc. v. Heiner*, Wyo., 663 P.2d 518 (1983); *Scherling v. Kilgore*, Wyo., 599 P.2d 1352 (1979).

In the face of a silent record I cannot agree that this court is justified in speculating about what occurred in the course of the jury's deliberations.